JIMMY NEUSCHAFER, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 14807

August 27, 1985                                    705 P.2d 609

*Ronald F. Cauley; Linda Edmiston,* Reno, for Appellant.

*Brian McKay,* Attorney General, *Dan Reaser,* Deputy Attorney General, Carson City, for Respondent.

## OPINION

By the Court, Mowbray, J.:

A jury convicted appellant Jimmy Neuschafer of the first degree murder of Johnnie Johnson aka Willard Taylor.[1] At the penalty hearing, the jury found that the homicide had been committed under three aggravating circumstances and no mitigating circumstances. The jury returned the penalty of death. On appeal, Neuschafer raises three assignments of error, none of which warrants reversal of the judgment of conviction or the sentence. Having perceived no error, we conclude that Neuschafer was fairly tried, convicted and sentenced, and we affirm.

In August 1981, Neuschafer and Johnnie Johnson were housed in the "S" wing of Unit 5 in the Nevada State Prison (maximum

---

[1] This opinion will refer to the victim as Johnnie Johnson.

security) in Carson City. The "S" wing was designated close custody. Inmates housed in the "S" wing could not leave the wing and inmates from other sections of the prison could not enter it. Regulations for the "S" wing, effective in August 1981, permitted only two men to be out of their cells and in the wing common areas at one time. Cells in the "S" wing were locked and unlocked by remote control. Guards were stationed in the glass walled control room. They could see parts of the wing directly and other parts through video cameras. Guards communicated with inmates in the wing by intercom.

Johnnie Johnson was the wing porter for the "S" wing. The wing porter keeps the wing clean, serves meals and passes out supplies to the inmates. The wing porter is permitted to be out of his cell all day. Other inmates, one at a time, are released from their cells for an hour or two a day. Thus, in the "S" wing during the first part of August 1981, only one inmate besides Johnnie Johnson was allowed out of his cell at any given time.

At 7:30 a.m. on August 18, 1981, Johnnie Johnson was released from his cell. Ten minutes later Neuschafer was released from his cell. Inmate Frederick Heimrich, who was housed next to Johnson's cell, testified that Neuschafer helped Johnson serve breakfast that morning. Then Heimrich heard Neuschafer and Johnson argue over "somas." Neuschafer was prescribed somas, pain pills, for headaches. Apparently, Johnson had paid Neuschafer for some somas but Neuschafer refused to give them to Johnson. Heimrich heard them argue for some time, then he heard Johnson enter Johnson's cell and Neuschafer follow him.

Inmate Gregory Barren said that he, too, heard Johnson and Neuschafer enter Johnson's cell. Barren then heard a thud against the wall and the squeak of bed springs in Johnson's cell. According to Barren, when Neuschafer returned to his own cell, he told Barren he had killed Johnson.

Heimrich testified when Neuschafer came out of Johnson's cell he hung a blanket over the doorway. At 9:30 a.m. Neuschafer had himself locked into his cell. Neuschafer told the guard to release Heimrich. After Heimrich was released, he took a note to Johnson. Johnson was lying on the floor of his cell. Heimrich testified that he thought Johnson was asleep since inmates often sleep on the floor. Heimrich further testified that around 11:00 a.m., Neuschafer told him to report Johnson as a "man down." A man down means an inmate is sick or injured in his cell. Heimrich informed the prison guards over the intercom that there was a man down.

Responding to the report, the guards entered the wing and removed a blanket from over the doorway of Johnson's cell. They found Johnson lying on the floor, tightly wrapped in a sheet from his neck to his ankles. A noose made of braided strips of bed

sheets was around his neck. The noose or ligature was so tight that the skin was bulging on either side of it: a guard had to use a pocket knife to cut it off. A criminologist testified that the strips of sheet making up the portion of the ligature around Johnson's neck were made of cotton and were consistent with the torn cotton sheets found in Neuschafer's cell. The sheets in Johnson's cell were polyester and cotton.

The guards attempted to resuscitate Johnson. He was taken by ambulance to a hospital in Carson City. Johnson died the next day due to a shortage of oxygen to his brain caused by the ligature around his neck. A pathologist testified that there was blood in Johnson's spinal cord indicating that his neck had been snapped back with some force.

At 5:45 p.m. on August 18, 1981, inmate Douglas Robinson gave a note to a correctional officer, Sonya Turek. Robinson testified that Neuschafer had given him the note with instructions to give it to the authorities. The note read: "To Whom It May Concern, I did something bad to Johnnie Johnson this morning so come and get me. Sincerely, Jimmy Neuschafer." At 8:51 p.m. that same day, inmate Barren handed another note to Turek. Barren testified that he had written a note to Neuschafer asking what had happened to Johnson. Neuschafer wrote back after ripping off the top of the paper with Barren's question on it. Barren delivered to Turek what Neuschafer had written: "It started by him taking things first. My [illegible]. . . . And this morning he tried to f--k me. I just couldn't let that happen. So I tried to hang him. Please forgive me. I really feel bad, what I did." A questioned documents expert testified that both notes were written by Neuschafer. The contents of these notes were read into evidence without objection.

At 6:45 p.m. on August 18, 1981, Neuschafer was interviewed by Rick Ricards and Ed Forrest, members of the prison staff investigating Johnson's death. Neuschafer was advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). He requested an attorney. No attorney was provided, and the interview continued. Neuschafer made an incriminating statement. The defense successfully moved to have this statement excluded at trial.

Following this interview, Neuschafer was placed in solitary confinement. Between August 18 and August 21, 1981, Neuschafer sent a note to the prison authorities. When questioned under oath, Neuschafer could not recall whether or not this note had contained a request to talk to investigators about the murder. Ricards set up an interview between Neuschafer and Detective Michael Efford of the Carson City Sheriff's Department. Ricards was told that Neuschafer wanted to talk to the police. Efford had also been told that Neuschafer had asked to talk to him. Efford was not told that Neuschafer had been previously interviewed and

had requested an attorney. At the interview on August 21, 1981, Efford read Neuschafer his *Miranda* rights. Neuschafer indicated that he understood them and proceeded to give another incriminating statement. This statement was read into the record at trial over objections by defense counsel.

The jury found Neuschafer guilty of first degree murder. At the penalty hearing, the State presented evidence that Neuschafer had been convicted in May 1976 of raping and murdering two teenage girls. Neuschafer was serving the first of two consecutive life sentences without parole that he received for that conviction when Johnson was killed. After the penalty hearing, the jury returned a verdict finding three aggravating circumstances: that the murder was committed by a person under a sentence of imprisonment; that the murder was committed by a person who was previously convicted of another murder; and that the murder involved torture, depravity of mind or mutilation of the victim. The jury found no mitigating circumstances and sentenced Neuschafer to death. Neuschafer appeals from the judgment of conviction and the death sentence.

Neuschafer suggests that the admission of his August 21, 1981 statement was in violation of the rule enunciated by the United States Supreme Court in Edwards v. Arizona, 451 U.S. 477 (1981). In *Edwards,* the Court held that an accused who has asserted his right to consult counsel during police questioning "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. The Court reversed Edwards' conviction because he had not initiated the second interrogation which resulted in a statement admitted against him at trial.

Neuschafer contends that the facts of the case at bar reveal a clear violation of the *Edwards* rule which requires reversal of his conviction. We do not agree. Neuschafer requested an attorney during the August 18, 1981 interview with prison investigators. No attorney was provided between August 18 and August 21, 1981. The record is unclear whether Neuschafer initiated the communication which lead to the August 21, 1981 interview. Evidence suggests that Neuschafer requested to speak to authorities regarding the Johnson murder in a note he wrote and gave to prison employees before August 21, 1981. In Oregon v. Bradshaw, 462 U.S. 1039 (1983), the Supreme Court emphasized that *Edwards* required a two-part inquiry into the admissibility of statements obtained after an accused has requested an attorney. First, the court must determine whether the accused initiated

contact with police and second, whether an accused who had initiated contact also validly waived his right to counsel. 462 U.S. at 1044. The district court found that the August 21, 1981 statement was voluntary. From our review of the record, we conclude that Neuschafer knowingly and intelligently waived his right to consult an attorney before speaking to Detective Efford. At the start of the August 21, 1981 interview, Neuschafer was read his *Miranda* rights and he indicated he understood them. Further, at the hearing on the motion to suppress, Neuschafer testified that he spoke with Detective Efford voluntarily, knowing that he did not have to make a statement. We hold that the second aspect of the *Edwards* test was satisfied.

Assuming, *arguendo,* that Neuschafer did not initiate the August 21, 1981 interview, we hold that any error in admitting the August 21, 1981 statement was harmless beyond a reasonable doubt due to the overwhelming evidence of Neuschafer's guilt. *See* Allen v. State, 91 Nev. 78, 530 P.2d 1195 (1975). In the unique context of this case, Neuschafer was the only inmate who had access to the victim at the time Johnson was murdered. Two other inmates testified they heard Johnson and Neuschafer enter Johnson's cell and Neuschafer come out alone, after sounds of a struggle were heard. Further, Neuschafer acknowledged his responsibility for Johnson's death in his two handwritten notes which were admitted into evidence without objection. In these circumstances, the verdict was free from doubt and any error was harmless. Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979).

Neuschafer also contends that his death sentence must be set aside because the third aggravating factor found by the penalty jury, that the murder involved "torture, depravity of mind or mutilation of the victim," is unconstitutionally vague. *See* NRS 200.033(8). This Court has previously rejected this challenge to the constitutionality of NRS 200.033(8). Deutscher v. State, 95 Nev. at 677.[2] Neuschafer refers this Court to Godfrey v. Georgia, 446 U.S. 420 (1980), and suggests that it stands for the proposition that "depravity of mind" as an aggravator is under all circumstances unconstitutionally vague. We do not read *Godfrey* as so holding. Rather, the *Godfrey* Court held that the state supreme court applied an overbroad interpretation of the phrase "outrageously or wantonly vile, horrible or inhuman [involving] depravity of mind" when the Georgia court found that the partic-

---

[2]In *Deutscher* the penalty jury was instructed on the meaning of "torture," "depravity of mind" and "mutilation." 95 Nev. at 677, 601 P.2d at 412-413. We note that the penalty jury in the case at bar was fully instructed on the definition of "torture" and "depravity of mind."

ular facts of the case, where the defendant killed his wife and mother-in-law with single shotgun blasts, demonstrated "depravity of mind." 446 U.S. at 432. The Court reversed the sentence of death which was based upon "depravity of mind" as the sole aggravator. *Id.* at 433. The homicides in *Godfrey* clearly do not come within the parameters of a sufficiently narrow interpretation of the phrase "depravity of mind." The facts of the murder by strangulation in the case at bar, however, do provide sufficient evidence from which the jury could find "depravity of mind" as an aggravating circumstance. We hold that NRS 200.033(8) is not unconstitutionally vague on its face or as applied in this case.

Finally, Neuschafer contends that the sentence of death is disproportionate and should be set aside. *See* NRS 177.055(2)(d).[3] As evidence of the disproportionality, Neuschafer relies on the disparity between the death sentence he received for strangling Johnnie Johnson and the life sentences, with or without parole, received by three other defendants who were also convicted of strangling a single fellow inmate while in prison.[4] Neuschafer's comparison of his sentence with the sentences of Mercado, Price and Russo ignores the fact that none of the other men had been previously convicted of murder. In contrast, Neuschafer had been previously convicted of two counts of first degree murder for the deaths of two girls, aged thirteen and fifteen, who had been raped and then shot. Further, neither Mercado, Price nor Russo were serving life sentences when they killed Jackson. Neuschafer was serving the first of two consecutive life sentences without parole when he murdered Johnnie Johnson. Considering these circumstances and comparing the facts of this crime and the background and characteristics of this defendant with similar cases, we conclude that the death sentence in this case is not disproportionate.[5] *See* Nevius v. State, 101 Nev. 238, 699 P.2d

---

[3]NRS 177.055(2)(d) was recently amended to abolish the proportionality review requirement. This amendment became effective June 6, 1985. 1985 Stats. ch. 527 § 1, at 1597-1598. The prohibition against ex post facto laws requires that we apply the law as it existed when the crime was committed. *See* Goldsworthy v. Hannifin, 86 Nev. 252, 468 P.2d 350 (1970). Therefore, we must conduct a proportionality review of appellant's sentence.

[4]Michael Thomas Mercado received life without parole for the first degree murder of Danny Lee Jackson; Patrick Russell Price received life with the possibility of parole for Jackson's murder (Mercado v. State, 100 Nev. 535, 688 P.2d 305 (1984)); James Edward Russo also received life with the possibility of parole for Jackson's murder (Order Dismissing Appeal No. 14501 filed February 1, 1985).

[5]We have also conducted the separate "arbitrariness review" required by NRS 177.055(2)(c), and have concluded that the death penalty in this case was not imposed under passion, prejudice or any arbitrary factor.

338

1053 (1985); Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985); Deutscher v. State, 95 Nev. 669.

We have found no merit to appellant's assignments of error and have concluded that the death penalty in this case is not disproportionate. Accordingly, we affirm the judgment of conviction and the sentence of death.

SPRINGER, C. J., and GUNDERSON, STEFFEN, and YOUNG, JJ., concur.