*1159 OPINION
By the Court,
Shearing, J. :
On May 22, 1992, Gerald Lane and James Millhouse left a party and headed to downtown Reno. Lane brought a gun with him. After visiting several casinos, the men separated for about five minutes. When Millhouse next saw Lane, Lane was talking to Frederick Spruell. According to Spruell, Lane approached him at approximately 4:00 a.m. and, after asking him if he was looking for “something,” asked him how much money he had. Lane then told Spruell to “give it up.” When Spruell declined to do so, Lane shot him in the stomach and fled.
Millhouse testified that he heard a gunshot and that when Lane rejoined Millhouse, he told Millhouse that he had just shot a man. The two men then ran away. Millhouse was running ahead of Lane when a bicyclist rode past him. Millhouse heard another gunshot. The man on the bicycle was William Boone. According to Boone, he was riding home at approximately 5:00 a.m, carrying bags of groceries on his handlebars. He saw Millhouse in the bushes and rode across the street away from Millhouse. He then saw Lane standing in a driveway. Lane ran up behind Boone and yelled out to him. Lane then shot Boone in the right hand, whereupon Boone lost control of his bicycle and his groceries spilled out onto the ground. Boone stopped and Lane began to approach, but Lane was distracted by something and quickly ran away.
Millhouse testified that he saw Lane running toward him, yelling for Millhouse to join him. Millhouse claimed he said no, and went directly toward a cab and begged the cab driver to take him home. When the cab driver refused, Lane and Millhouse proceeded South on Virginia Street, stopped at a bar for a while, and eventually entered a different cab. Millhouse told the cab driver, Raymond Dunham, to drive to the Peppermill. Along the way, however, Lane told Dunham to drive to the nearby Lake-view Apartments.
When they arrived at the apartments, Millhouse prepared to pay the fare, but Lane pulled out the gun. Millhouse testified that he ran off at this point and seconds later heard gunshots. The police found the cab a short time later. Inside the cab was Dunham. He was dead. Dunham had been shot three times in the head from a position directly behind him.
According to Dorothy Moore, Lane arrived at her apartment, *1160 and told her that he had shot a cab driver in the head three times and taken money. He displayed the money to Moore and then went into the kitchen and washed the gun off in the sink. He then placed the gun in a potato chip bag and hid it underneath the bed until she told him she did not want it at her apartment.
Lane was arrested and convicted, pursuant to a jury verdict, of one count each of first degree murder with the use of a deadly weapon, robbery with the use of a firearm, attempted murder and attempted robbery with the use of a firearm. He was sentenced to death. Lane appeals from his judgment of conviction and sentence based on five theories.
First, Lane argues that the capital sentencing process was administered in a racially discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Second, Lane claims he was denied a fair trial because the jury was not impartial. He claims that a juror improperly influenced the jury by reading certain materials to them, causing prejudice against Lane. Third, Lane asserts that the district court erred in denying Lane’s motion to suppress statements made during interrogation because the statements were involuntary. Fourth, Lane states that he was denied a fair penalty hearing because the district court admitted evidence which violated NRS 176.015,[1] and which was unduly prejudicial. Fifth, Lane argues that he was denied a fair penalty hearing because the district court allowed duplicative aggravating factors in the instructions given to the jury. We consider each of Lane’s contentions in turn.
I. Equal Protection Challenge
Lane asserts that the imposition of the death penalty denied him equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution. He bases this contention on a survey he has provided to this court indicating that the Washoe County District Attorney’s office has sought the death penalty in eighty percent of the cases involving a black defendant with no prior felony conviction whereas it has not sought the death penalty in eighty percent of the cases involving a white defendant with a prior felony conviction. Lane concludes *1161 from this survey that “ [i] f accused of murder in Washoe County, it is better to be a white felon than a black with no prior felony convictions.”
A defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination and a discriminatory effect. McCleskey v. Kemp, 481 U.S. 279, 292 (1987). In McCleskey, the defendant, McCleskey, claimed that Georgia’s capital punishment statute violated the Equal Protection Clause of the Fourteenth Amendment. 481 U.S. at 291. McCleskey presented a statistical study to demonstrate that race infected the administration of Georgia’s statute in two ways. Id. First, he claimed that persons who murdered whites were more likely to be sentenced to death than persons who murdered blacks. Id. Second, McCleskey contended that black murderers were more likely to be sentenced to death than white murderers. Id.
The United States Supreme Court stated that to prevail under the Equal Protection Clause, McCleskey had to prove that the decisionmakers in his case acted with a discriminatory purpose. Id. at 292. The Court further stated that while it had accepted statistics as proof of intent to discriminate in certain limited contexts — for example, in jury venire-selection and Title VII cases — a prosecutor’s decision to seek the death penalty was significantly distinguishable from these other two contexts. Id. at 293-94. The Court stated:
[T]he policy considerations behind a prosecutor’s traditionally “wide discretion” suggests the impropriety of our requiring prosecutors to defend their decisions to seek death penalties “often years after they were made.” Moreover, absent far stronger proof, it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty.
Id. at 296-97 (citations omitted).
As in McCleskey, in the case at bar prosecutors who have exercised their discretion in seeking the death penalty would be required to defend their actions years after these decisions were made. Additionally, as in McCleskey, the prosecutor in this case had a legitimate and unchallenged explanation for his decision: Lane committed an act for which the United States Constitution and Nevada laws permit imposition of the death penalty. In McCleskey, the Court also stated, “Because discretion is essential *1162 to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused.” Id. at 297. No such “exceptionally clear proof” exists in this case.
Assuming, arguendo, that Lane’s statistics are accurate, we must reject his equal protection challenge because his statistics fail to prove the existence of purposeful discrimination or that the prosecutor’s discretion has been abused. After careful consideration of Lane’s claim, we conclude that the statistical survey of eighty-six murder cases prosecuted by the Washoe County District Attorney’s office is inadequate to support a conclusion that Washoe County intentionally seeks the death penalty in a racially discriminatory manner. The survey’s fatal flaw is that it fails to demonstrate that black and white persons who are similarly situated are treated differently.
First, Lane’s statistics do not sufficiently narrow the factors which weigh into the prosecutor’s decision to seek the. death penalty. While the survey does tend to show that the death penalty has been sought more often for black non-felons than for white felons, the survey fails to take into consideration the relative strengths and weaknesses of those eighty-six cases, the individual characteristics of the offenses, whether aggravating or mitigating circumstances were present or absent, the nature of the aggravating and mitigating circumstances, whether plea bargains were offered and accepted, and the individual characteristics and attitudes of each capital defendant.
Without such vital information, we cannot determine whether or to what extent race may have been implicated in the capital cases involved in the survey. We therefore have no basis for holding that there was a racially discriminatory purpose behind the Washoe County District Attorney’s decision to seek the death penalty in this case.
II. Juror Misconduct
During the jury deliberations, the trial judge received a note from several members of the jury informing the judge that one of the jury members, Tom Lacey, had informed the rest of the jury that he sells or sold marijuana and that he uses a published booklet “as his law and guidance in persuading his decisions.” Directly prior to receiving this note, the trial judge had been informed by the bailiff that on the evening before, the bailiff had opened the door to the jury room to inquire if the jury wished to continue deliberating and found a juror reading a booklet entitled, “Citizens’ Rule Book, A Jury Handbook” to the rest of the jury.
*1163 The district court read a passage from the booklet, part of which stated that a juror has the power, through a single vote of not guilty, to “nullify every rule or law that is not in accordance with the principles of natural, God-given, Common or Constitutional law.” The record does not indicate what part of the booklet jurors heard. After consulting with the prosecutor and defense counsel, the district court conducted a hearing outside the presence of the jury. First, the district court questioned Lacey, who admitted having the booklet and stated that while he had not read it aloud, other jurors had read it to themselves. After questioning, the State requested that Lacey be removed from the jury. The defense did not object, and the request was granted. An alternate juror replaced Lacey.
The district court then questioned each of the remaining jurors separately. Each juror stated that Lacey had read from the booklet. The jury members also indicated that they were not influenced by Lacey or the booklet, that they would abide by their oaths as jurors, that they would follow the law as instructed, and that they would decide Lane’s case based upon the facts and evidence adduced at trial. The district court also questioned the alternate replacing Lacey, who stated that she had seen the booklet because Lacey was showing it the day before, but that she had not read it. The alternate juror stated that she was not influenced by the booklet and would follow the district court’s instructions of law.
Lane moved for a mistrial based on juror misconduct. The district court denied his motion and ordered the jury to start over with deliberations. The jury subsequently informed the district court that it reached unanimous guilty verdicts on all four counts twice, once with Lacey and a second time with the alternate juror. Thereafter, at the beginning of the penalty phase of Lane’s trial, Lane moved for a new trial, arguing that Lacey concealed a bias during voir dire. The district court denied this motion. On appeal, Lane argues that he was denied a fair trial because the jury was not impartial, and that the district court erred in denying his motions for mistrial and for a new trial.
The denial of a motion for a mistrial is within the trial court’s sound discretion, and that ruling will not be disturbed on appeal in the absence of a clear showing of abuse. Owens v. State, 96 Nev. 880, 883, 620 P.2d 1236, 1238 (1980). Lane contends that the jury expressed its hostility toward Lacey by convicting Lane; however, there is no evidence in the record indicating that Lacey was predisposed to acquitting Lane. Indeed, in issuing its guilty verdict, the jury stated that even with Lacey, it had unanimously found Lane guilty of all four counts. In light of this and the fact *1164 that upon questioning, the jurors stated that they had not been influenced by Lacey and would follow the law as instructed, we hold that the district court did not abuse its discretion in denying Lane’s motion for a mistrial.
Regarding the district court’s denial of Lane’s motion for a new trial, we note at the outset that not every incidence of jury misconduct requires the granting of a motion for a new trial. Barker v. State, 95 Nev. 309, 313, 594 P.2d 719, 721 (1979). However, a new trial must be granted unless it appears, beyond a reasonable doubt, that no prejudice has resulted. Id. It is for the trial court to determine in the first instance whether juror misconduct has resulted in prejudice to a litigant, and its judgment thereon will not be overturned unless an abuse of discretion is manifest. Id. In the instant case, Lane contends that he was entitled to a new trial based on the theory that Lacey concealed bias during the voir dire. Lane’s contention is without merit. Since Lacey was replaced with an alternate juror and since the other jurors were not influenced by Lacey, Lacey’s views resulted in no prejudice to Lane. Therefore, the district court acted within its discretion in denying Lane’s motion for a new trial. We hold that Lane was aíforded a fair trial.
III. Admissibility of Lane’s Statements
During the trial, the state introduced, through Officer David Jenkins, inculpatory statements made by Lane during interrogation by police officers. Lane contends that the statements introduced by Officer Jenkins were involuntary. He states that he had been awake continuously for twenty-four hours prior to questioning and had been drinking heavily the previous day, that he was questioned for nearly two hours by three police officers, only consumed a candy bar and a Coca-Cola while in custody, and that he was not informed during questioning that he could contact a lawyer or friends.
This court will not disturb a district court’s finding regarding the voluntariness of a confession unless that finding is plainly untenable. Robertson v. State, 97 Nev. 138, 139, 625 P.2d 565, 565 (1981); Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 109 (1979). In determining whether a defendant’s confession is voluntary, we consider the effect of the totality of the circumstances on the will of the defendant. Passama v. State, 103 Nev. 212, 213, 735 P.2d 321, 323 (1987). The question in each case is whether the defendant’s will was overborne when he confessed. Id.
*1165 In the instant case, we hold that Lane’s will was not overborne and that his statements were voluntary. During the suppression hearing, Officer Jenkins testified that there were no signs of intoxication when the officers questioned Lane and that aside from an occasional yawn, Lane did not demonstrate any signs of exhaustion. Officer Jenkins testified that Lane was lucid and coherent and that he never requested to speak with an attorney, friends or relatives. During the hearing and the trial, Officer Jenkins testified that he read Lane his Miranda rights prior to questioning. The “Admonition and Waiver of Rights” form bearing Lane’s signature was introduced into evidence. Based on the foregoing, the district court’s ruling, made after listening to testimony and to an audiotaped portion of the interrogation, was not “plainly untenable.”
IV. The Penalty Phase
A. Admissibility of Letters
Hazel Dunham, sister of the victim, Raymond Dunham, testified during the penalty phase of Lane’s trial. Through Hazel Dunham, the state introduced two letters into evidence, over defense counsel’s objection. The first letter was from Carol Collins, R.N., the Procurement Coordinator for Intermountain Recovery System. This letter expressed Collins’ condolences to Hazel Dunham and described the donor recipients for Raymond Dunham’s organs. The second letter was from Raymond Dunham’s friend, and described the ten year friendship between him and Dunham.
Lane argues that these letters were introduced in violation of NRS 176.015 and that they were unduly prejudicial. Lane’s reliance on NRS 176.015 is misplaced. This court has held that NRS 176.015 is inapplicable to hearings where the death penalty is imposed. Hardison v. State, 104 Nev. 530, 535, 763 P.2d 52, 55 (1988).
The state argues that the statements were admissible under Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597 (1991), and Homick v. State, 108 Nev. 127, 825 P.2d 600 (1992). In Payne, the United States Supreme Court overruled its prior cases which prohibited “victim impact” evidence during the penalty phase of a capital trial. The Payne court stated: “A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed.” 501 U.S. at 827, 111 S. Ct. at 2609. It therefore held that the federal constitution did not bar the admission of victim impact evidence *1166 and prosecutorial argument on that subject. Id. We lauded the Payne decision in Homick, and concluded that error did not result from the comments of a prosecutor during closing argument regarding the surviving members of the victims’ families. 108 Nev. at 136-37, 825 P.2d at 606.
While the reasoning of Payne and Homick is relevant, a more specific provision governs the question of admissibility presented in the instant case. During the penalty phase of a case in which the death penalty is sought, NRS 175.552 governs the admissibility of evidence regarding the victim. See Hardison v. State, 104 Nev. 530, 763 P.2d 52 (1988). NRS 175.552 provides that during the penalty hearing of a first degree murder case, “evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.” (Emphasis added.) [Headnotes 11-13]
Questions of admissibility during the penalty phase of a capital murder trial are largely left to the discretion of the trial judge. Milligan v. State, 101 Nev. 627, 636, 708 P.2d 289, 295 (1985), cert, denied, 479 U.S. 870 (1986). There was not an abuse of discretion in this case. Moreover, even if admission of the two letters did constitute an abuse of discretion, we hold that in light of the five aggravating factors found by the jury, any error which resulted from their admission was harmless. See NRS 178.598.
B. Aggravating Circumstances
In the case at bar, the jury found five aggravating circumstances[2] Lane argues that he was denied a fair trial because the aggravating circumstances articulated by the district court and found by the jury were inconsistent and duplicative.
*1167 NRS 200.033 enumerates the circumstances by which murder of the first degree may be aggravated. Among the five aggravating circumstances found by the jury were that the murder was committed while Lane was engaged in the commission of or flight after robbery, NRS 200.033(4), and also that the murder was committed at random, without apparent motive. NRS 200.033(6). Lane argues that these two aggravating circumstances are inconsistent. However, we have held that if the killing was not necessary to accomplish the robbery or could have been completed without killing the victim, the two aggravating factors are not inconsistent. Paine v. State, 107 Nev. 998, 999-1000, 823 P.2d 281, 282 (1991); Bennett v. State, 106 Nev. 135, 143, 787 P.2d 797, 802 (1990), cert. denied, 498 U.S. 925 (1990). In the instant case, there was no indication that Lane had to kill Dunham in order to rob him; therefore, Lane’s contention is without merit. Lane also asserts that the jury’s findings that Lane committed murder while attempting to commit robbery and while engaged in the commission or flight after committing robbery, NRS 200.033(4), duplicate its finding that Lane committed the murder to “receive money or any other thing of monetary value.” NRS 200.033(6). Lane states that a robbery or attempt to rob cannot be accomplished without trying to take money or some other thing of monetary value. This contention is also without merit.
In Guy v. State, 108 Nev. 770, 839 P.2d 578 (1992), cert. denied, ....... U.S. ......., 113 S. Ct. 1656 (1993), we rejected a challenge to a jury’s finding that the murder was committed while the person was engaged in the commission of or an attempt to commit robbery and that the murder was committed to receive money or any other thing of monetary value. We stated that the evidence supported the aggravating factors: the appellant murdered the victim while robbing him and also for the purpose of obtaining cocaine, a thing of monetary value. Id. at 781, 839 P.2d at 585.
Additionally, this court has previously rejected an appellant’s argument that since the felonies of burglary and robbery “arose out of the same indistinguishable course of conduct,” they could not be stated as two separate aggravating circumstances. Bennett v. State, 106 Nev. 135, 142, 787 P.2d797, 801, cert. denied, 498 U.S. 925 (1990). We stated that if the legislature intended to prohibit the use of multiple aggravating circumstances in this context, it would have provided accordingly. Id. at 143, 787 P.2d at 802. Therefore, we held that if a defendant can be prosecuted for each crime separately, each crime can be used separately as an aggravating circumstance. Id. at 142, 787 P.2d at 801.
*1168 In this case, although the two aggravating circumstances arose out of the same indistinguishable course of conduct, it appears that the legislature intended that they may be considered as two separate aggravating factors. We therefore find Lane’s argument unpersuasive.
In reviewing death sentences, this court must consider whether the evidence supports the jury’s findings of the aggravating circumstances. NRS 177.055(2)(b). In reviewing each of the five aggravating circumstances found by the jury, we conclude that one of the five is invalid. The second aggravating circumstance was found by the jury as follows:
The murder was committed while GERALD CARTER LANE was engaged in flight .after attempting to commit robbery and GERALD CARTER LANE attempted to kill FREDERICK SPRUELL; or that he knew or had reason to know that life would be taken or lethal force used.
This finding is based on NRS 200.033(4), which provides:
4. The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnapping in the first degree, and the person charged:
(a) Killed or attempted to kill the person murdered; or
(b) Knew or had reason to know that life would be taken or lethal force used.
As is evident, the jury’s finding does not comport with the statutory requirements. NRS 200.033(4) requires a finding that the defendant “(a) Killed or attempted to kill the person murdered; or (b) Knew or had reason to know that life would be taken or lethal force used.” The jury found disjunctively that Lane killed or attempted to kill Spruell, or knew or had reason to know that life would be taken or lethal force used. No evidence was presented that Lane “knew or had reason to know that life would be taken or lethal force used.” Therefore, the jury could only find this aggravating circumstance if it found that Lane “killed or attempted to kill the person murdered,” i.e., Dunham. Instead of supporting this aggravating circumstance with a finding that Lane killed or attempted to kill Dunham, the jury found that Lane attempted to kill Spruell. Thus, the jury found either an invalid aggravating circumstance or one that the evidence did not support. Accordingly, we hold that this aggravator may not stand.
*1169 However, we have carefully reviewed the evidence in this case and conclude that it supports the jury’s finding of each of the remaining four aggravating circumstances. In light of the fact that no mitigating circumstances were found by the jury, we hold that the jury’s finding of an invalid aggravating factor constituted harmless error. See Clemons v. Mississippi, 494 U.S. 738 (1990); Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993); Libby v. State, 109 Nev. 905, 859 P.2d 1050 (1993); see also NRS 200.030(4)(a). Such reweighing compels us to affirm Lane’s death sentence.
In cases in which the death penalty is imposed, this court is also statutorily required to consider whether the death sentence was imposed under the influence of passion, prejudice or any arbitrary factor and whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2).
We conclude that the death sentence was not imposed under the influence of passion, prejudice or any arbitrary factor, nor was it excessive in this case. The jury sentenced Lane to death based upon the aggravating circumstances of the murder revealed during the trial. The jury found beyond a reasonable doubt that Lane killed Dunham by shooting him three times in the back of the head. This was a senseless and brutal murder, the culmination of a spree of violence and attempted robbery, during which Lane shot two others, one of whom was seriously injured. Considering the circumstances of the crime and the nature of Lane’s character, the jury’s determination that Lane should be put to death for the murder of Dunham was not excessive.
Having determined that Lane was fairly tried, convicted and sentenced, we affirm the district court’s judgment of conviction and the sentence of death.
Rose, C. I, and Steffen and Young, JJ., concur.

 NRS 176.015 states in pertinent part:
3. Before imposing sentence the court shall afford the victim an opportunity to:
(a) Appear personally or by counsel; and
(b) Reasonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution.

 The five aggravating circumstances consisted of the following:
1. The murder was committed by Lane who created a great risk of death to more than one person by means of a weapon or course of action which would normally be hazardous to the lives of more than one person. NRS 200.033(3).
2. The murder was committed while Lane was engaged in flight after attempting to commit robbery, and Lane attempted to kill Frederick Spruell; or that he knew or had reason to know that life would be taken or lethal force used. NRS 200.033(4).
3. The murder was committed while Lane was engaged in the commission or flight after committing robbery, and Lane killed Raymond Dunham; or that he knew or had reason to know that life would be taken or lethal force used. NRS 200.033(4).
4. The murder was committed upon one or more persons at random and without apparent motive. NRS 200.033(9).
5. The murder was committed by Lane for himself or another to receive money or other thing of monetary value. NRS 200.033(6).