HERBERT DWAYNE WESLEY, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 27175

April 30, 1996                                    916 P.2d 793

[Rehearing denied October 17, 1996]

*Morgan D. Harris,* Public Defender, and *Michael L. Miller,*
Deputy, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart
L. Bell,* District Attorney, *James Tufteland,* Chief Deputy, and
*David Schwartz,* Deputy, Clark County, for Respondent.

504

## OPINION

*Per Curiam:*

A jury convicted appellant Herbert Dwayne Wesley ("Wesley") of one count of robbery with a deadly weapon and two counts of murder with a deadly weapon. The jury sentenced Wesley to death. For the reasons set forth below, we affirm the judgment of conviction and sentence.

### FACTS

On Tuesday, March 10, 1992, Robert Walker ("Walker"), a neighbor of Ike and Doella Wesley's ("Ike and Doella"), noticed Wesley driving Ike's truck. Because Walker had never seen Wesley driving Ike's truck before, Walker asked Wesley where Ike was. Wesley, who was Ike's son and Doella's stepson, resided in Ike and Doella's home. He said Ike was at work. Wesley then entered Ike and Doella's home after unlocking the security bars and front door. Later that day, Walker knocked on the door of Ike and Doella's home to contact Ike. After no one responded to the knocks, Walker looked through a window and noticed Ike's body lying on the floor.

Daniel Holstein ("Holstein"), a crime scene analyst for the Las Vegas Metropolitan Police Department, went to Ike and Doella's home to investigate the apparent homicide. Holstein

found Ike's body in the home's dining room/kitchen and found Doella's body covered by a blanket in a bedroom opposite the kitchen. Holstein obtained fingerprints and blood samples from objects in the house. Holstein also noticed a television antenna on the floor of the residence and a tabletop with a dust pattern, both indicating that a television had been removed from the table.

Officer Robert Plummer ("Plummer") responded to Ike and Doella's home and left with Ike's grandson, Anthony Carter ("Carter"), to find Wesley. Plummer and Carter went to a home where Ike's truck was parked and later saw Wesley cautiously approach the truck. Plummer took Wesley into custody and transported him to Ike and Doella's home. Detective Norm Ziola ("Ziola") then questioned Wesley. Wesley stated that he had not been at the home since Sunday, March 8, 1992, when he borrowed Ike's truck. Ziola noticed abrasions on Wesley's hands. Ziola then arrested Wesley, impounded his clothes and transported him to the Clark County Detention Center.

Dr. Robert Jordan ("Jordan") performed autopsies on Ike's and Doella's bodies on March 11, 1992. Jordan discovered that Ike was stabbed approximately eighteen times in the head, neck, chest, abdomen and right hand. According to Jordan, Doella was stabbed thirty-six times, including twenty-six stab wounds in her chest and shoulders. Jordan concluded that Ike and Doella were killed between twenty-four and forty-eight hours before the autopsy, and that the killings occurred relatively contemporaneously.

On May 5, 1992, Wesley was charged by information with one count of robbery with a deadly weapon and two counts of murder with a deadly weapon. The State filed a notice of intent to seek the death penalty.

At trial, Roderick Rancher ("Rancher") testified that he knew Wesley for nearly ten years and that at 7 a.m. on March 9, 1992, Wesley asked Rancher if he wanted to buy a VCR, television or microwave. Rancher also testified that Wesley asked him where he could buy drugs. Wesley contacted Rancher again later in the day about purchasing the appliances. Rancher then went to Ike and Doella's home to buy the appliances. Wesley was wearing a blue robe and a towel was wrapped around his hand. Rancher saw blood on the robe and the towel. Wesley told Rancher that he cut his hand and spilled blood on the robe when he was cutting chicken.

Jackie Blood ("Blood") testified that she and Wesley had a child together and that she and the child spent a great deal of time with Ike and Doella. On March 8, 1992, Blood and Wesley had a heated argument at Blood's place of employment, and Wesley was forced to leave the establishment. Blood then notified Ike and

Doella that her child would no longer spend time at their house. On March 10, 1992, Blood saw Wesley in the front yard of Ike and Doella's home in a blue robe. Blood also stated that she never knew Ike and Doella to allow Wesley to use their truck. On cross-examination, Blood admitted that she was an ex-felon and that she did not tell the police in her initial statement that she saw Wesley on Tuesday morning in Ike and Doella's front yard.

A crime lab expert testified regarding blood tests that were conducted at a crime laboratory. Based on a phosphoglucomutase sub-typing system, the expert was able to distinguish Ike's, Doella's and Wesley's blood. The expert concluded that the blood taken from objects in Ike and Doella's home could have been Wesley's blood. Blood from the socks Wesley was wearing when he was arrested was from Doella, Ike or Wesley. Based upon the evidence presented, the jury found Wesley guilty on all counts.

During the penalty phase of the trial, the prosecution presented evidence that Wesley was convicted of assault with a deadly weapon and robbery in 1983. Also, Walker, Blood and one of Ike's co-workers testified that Ike was a fine friend and church member, and would be severely missed. Two witnesses testified that Doella was a fine person and they would miss her greatly. One witness stated that Wesley should die for killing Doella. Numerous witnesses testified that they did not think Wesley should receive the death penalty for his actions. At the conclusion of the penalty phase, the jury sentenced Wesley to death.

## LEGAL DISCUSSION OF GUILT PHASE

Wesley contends that nine errors occurred during the guilt phase of his trial. We conclude that none of Wesley's nine assignments of error merit reversal of Wesley's conviction.

### 1. Deputy district attorney's recusal

Before trial, Wesley's counsel requested that the district court recuse a deputy district attorney from this case because of an alleged personal relationship between the female deputy district attorney and the male district judge. The right to a fair trial incorporates the right to have a trial presided over by a judge who is free from bias or prejudice. Bias and prejudice mean, among other things, undue favoritism toward one of the litigants. See State v. Hill, 848 P.2d 1375, 1381-83 (Ariz. 1993). Further, courts must avoid any appearance of partiality, not merely to secure the confidence of litigants in a case, but to assure the public that fair results, meriting respect, follow every judicial determination. NCJC Canon 2; People v. Hrapski, 718 P.2d 1050, 1054 (Colo. 1986).

The district judge in this case admitted that a relationship existed between the deputy district attorney and himself, but explained that the relationship was merely professional. Wesley failed to present any non-speculative evidence that the judge had anything more than a professional relationship with the deputy district attorney. Also, the judge stated under oath that as an attorney for twenty-two years before taking the bench, and as a judge and active member of the State Bar, he personally knows nearly every attorney in Clark County. Without more proof of an intimate relationship, we conclude that the judge in this case acted properly by refusing to recuse the deputy district attorney.[1]

## 2. Wesley's prior criminal record

Wesley requested that the district court exclude any evidence of his 1983 convictions for robbery and assault with a deadly weapon. The district court ruled that the convictions could be admitted for the purpose of impeachment if Wesley testified. Wesley did not testify, and the prior convictions were not admitted during the guilt phase of the trial. Wesley argues that the denial of his motion to suppress his prior convictions was improper. The decision to admit evidence is within the sound discretion of the district court and will not be disturbed unless it is manifestly wrong. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). Evidence of a prior conviction may be admitted for the purpose of impeachment if the conviction involved a sentence of death or imprisonment for more than one year, and the conviction is not more than ten years old. NRS 50.095. Also, the Nevada Legislature intended district courts to admit evidence of prior convictions for crimes that reflect untruthfulness after balancing the probative value and prejudicial effect of the convictions. Yates v. State, 95 Nev. 446, 449-50, 596 P.2d 239, 241 (1979). Having fully reviewed Wesley's contention, we conclude that the district court was not manifestly wrong in ruling that Wesley's prior convictions could be admitted if Wesley testified. See id.; Anderson v. State, 92 Nev. 21, 23, 544 P.2d 1200, 1201 (1976).

## 3. Request for a continuance of trial

After the State prevailed on three motions to endorse names, the witness list for Wesley's trial was increased from fifty-three witnesses to seventy-seven witnesses during the two weeks pre-

---

[1]This opinion does not reach the question of whether the district court has the authority to recuse a certain member of the district attorney's office from a case.

ceding trial. Wesley objected to the endorsements and requested a continuance of trial because the preparation necessary for effective assistance of counsel allegedly could not be completed before the trial date. Wesley's request for a continuance of trial was denied; and Wesley now argues that the district court's endorsement of additional witnesses, coupled with the denial of his motion to continue the trial, denied Wesley effective assistance of counsel.

The decision to grant or deny trial continuances is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion. Doyle v. State, 104 Nev. 729, 731, 765 P.2d 1156, 1157 (1988). In three separate decisions, we have affirmed the endorsement of witness names one to four days before trial. *See* Armstrong v. State, 92 Nev. 675, 557 P.2d 272 (1976); Hess v. State, 73 Nev. 175, 313 P.2d 432 (1957); State v. Teeter, 65 Nev. 584, 200 P.2d 657 (1948). In the present case, Wesley had notice of the additional witnesses at least one week before trial and three weeks before the penalty hearing. Further, Wesley could clearly anticipate the type of testimony that would be elicited from the added witnesses because the witness list showed that nearly all the added witnesses were employees of the Las Vegas Police Department, the Parole and Probation Department or Ike's former employer. The other added witnesses were family members of the victims. Therefore, we conclude that the district court did not abuse its discretion by denying Wesley's request for a continuance.

### 4. *Jury voir dire*

During jury selection, the district court interrupted questioning and directed counsel to refrain from inquiring into the details of a certain juror's prior jury service. The juror was later removed through a peremptory challenge. When a defendant claims prejudice based on a "wasted" peremptory challenge, the claim must focus on whether the impaneled jury was impartial. Ross v. Oklahoma, 487 U.S. 81, 86 (1988). If the impaneled jury is impartial, the defendant cannot prove prejudice. *Id.* Because Wesley failed to assert any jury partiality or bias in this appeal, we conclude that he was not prejudiced by the district court's limitation on the voir dire examination of one juror.

### 5. *The State's opening statement*

During the State's opening statement, the prosecutor referred to a timeline chart that included two of Wesley's prior bad acts: (1) when Wesley was kicked out of Blood's place of employment

after their fight, and (2) Wesley's attempts to sell appliances to Rancher and buy illegal drugs. Wesley objected, arguing that the two acts were inadmissible and they were improperly shown to the jury before the court made a ruling on their admissibility. The district court overruled Wesley's objection, and the acts were later admitted during trial.

The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed unless manifestly wrong. *Petrocelli*, 101 Nev. at 52, 692 P.2d at 508. When admitting prior bad act evidence, the district court should conduct a recorded hearing that allows a meaningful opportunity to review the district court's exercise of discretion. Armstrong v. State, 110 Nev. 1322, 1324, 885 P.2d 600, 601 (1994); *Petrocelli*, 101 Nev. at 51, 692 P.2d at 508. We conclude that the district court adequately reviewed the admissibility of Wesley's prior bad acts on the record. After the opening statement, a bench conference was conducted outside the presence of the jury and on the record. Wesley presented his argument that the acts were inadmissible; and the judge, referring to a discussion that occurred at an unrecorded bench conference, specifically responded to the argument.

We further conclude that the district court did not abuse its discretion by ruling to admit the two acts in question. After Wesley was kicked out of Blood's place of employment, Blood called Ike and Doella and informed them that her son would no longer be visiting them due to Wesley's acts. Because Ike had a close relationship with Blood's child, he may have become upset and a confrontation between Wesley and Ike may have ensued. Because this incident occurred a day before the killings, it was probative of Wesley's probable confrontation with Ike. Also, the statements that Wesley made to Rancher were highly probative of Wesley's intent and motive to commit the charged robbery. Wesley attempted to sell appliances from Ike and Doella's home on the day the murders occurred, and Wesley's apparent motive was to buy illegal drugs. *See* NRS 48.045(2).

6.  *Autopsy photographs of the victims*

The district court, after reviewing the autopsy photographs of Ike and Doella, determined their probative value was not outweighed by their prejudicial effect and allowed certain photographs to be presented during Jordan's testimony. Wesley contends that the admission of the photographs was impermissably prejudicial. The admission of photographs of victims is

within the sound discretion of the trial court and will be disturbed only if that discretion is abused. Redmen v. State, 108 Nev. 227, 231-32, 828 P.2d 395, 398 (1992). Photographic evidence is admissible unless the photographs are so gruesome as to shock and inflame the jury. *See* Cutler v. State, 93 Nev. 329, 332, 566 P.2d 809, 811 (1977). The photographs admitted in this case assisted the jury in understanding the nature and quality of the wounds inflicted by the stabbings and were used by Jordan to explain the findings of his autopsy. While the photos may have been graphic and troubling to human sensibility, we conclude that the district court did not abuse its discretion by concluding that their probative value outweighed their potential for prejudice. Robins v. State, 106 Nev. 611, 623, 798 P.2d 558, 566 (1990), *cert. denied*, 499 U.S. 970 (1991).

### 7. *Threats and witness intimidation*

Wesley contends that the prosecutor's questioning of Rancher implied that Rancher was threatened by Wesley not to testify. The State argues that the questioning of Rancher focused on his reluctance to testify and never implied that violence was threatened by Wesley. Unless substantial credible evidence is presented that a defendant is the source of witness intimidation, implying that a defendant intimidated a witness is reversible error. Lay v. State, 110 Nev. 1189, 1193, 886 P.2d 448, 450-51 (1994). Here, Rancher stated that his own father's murder was the reason he was reluctant to testify. Also, Wesley's counsel opened the door to the prosecutor's disputed questions when, on cross examination, Wesley's counsel questioned Rancher about being in custody until he testified at the trial. Further, the prosecutor never stated that Wesley threatened or intimidated Rancher. Therefore, we conclude that the district attorney properly questioned Rancher on redirect examination to rehabilitate Rancher's credibility and did not imply that Wesley had threatened him.

### 8. *Reasonable doubt instruction*

Before closing arguments, the district court provided the jury with a reasonable doubt instruction that was adapted from NRS 175.191 and NRS 175.211. We upheld the same instruction in Bollinger v. State, 111 Nev. 1110, 901 P.2d 671 (1995), and Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991). After reviewing Wesley's assertions regarding the specific language of the instruction, we conclude that the reasonable doubt instruction was constitutionally sound because a reasonable likelihood did not exist that the jury applied the instruction in an unconstitutional

manner. *See* Victor v. Nebraska, 511 U.S. 1, 6, 114 S. Ct. 1239, 1243 (1994).

### 9. *Prosecutor's argument regarding reasonable doubt*

During the prosecutor's closing statement, he argued, "[I]f you feel it in your stomach and if you feel it in your heart . . . then you don't have reasonable doubt." Wesley contends that this statement improperly elaborated on the definition of reasonable doubt. Reasonable doubt is a subjective state of near certitude. McCullough v. State, 99 Nev. 72, 75, 657 P.2d 1157, 1158 (1983). However, when prosecutors attempt to rephrase the reasonable doubt standard, they venture into troubled waters. Howard v. State, 106 Nev. 713, 721, 800 P.2d 175, 180 (1990). On this basis, the prosecutor's comment appears improper. However, we conclude that the statement was harmless. The prosecutor referred to the language of the instruction before he made the comment to which Wesley now objects. Accordingly, we conclude that the jury was properly instructed on reasonable doubt, and the prosecutor's statement did not materially alter the jury's consideration of reasonable doubt.

## LEGAL DISCUSSION OF PENALTY PHASE

Wesley contends that seven errors occurred during the penalty phase of his trial. We conclude that none of Wesley's seven assignments of error merit vacating Wesley's sentence.

### 1. *Aggravating circumstances*

Pursuant to NRS 200.033(2)-(8), the State sought to present evidence of four aggravating circumstances during the penalty phase of Wesley's trial. Wesley's counsel filed a motion to strike the aggravating circumstances. Although the district court modified the language of one aggravator to comport with the facts of this case, the motion to strike aggravators was denied, and four aggravating circumstances were read to the jury.[2] The jury con-

---

[2]The aggravators presented to the jury were as follows:

1. The murder was committed by a person who was previously convicted of a felony involving the use or threat of violence to the person of another, to-wit: Assault With a Deadly Weapon and Robbery.

2. The murder was committed by a person who knowingly created a great risk of death to more than one person by means of a course of action which would normally be hazardous to the lives of more than one person.

3. The murder was committed while the person was engaged in the commission of or an attempt to commit any robbery.

4. The murder involved torture, depravity of mind or the mutilation of the victim.

cluded that aggravators one and four were present in the murder of Doella and aggravators one, three and four were present in the murder of Ike. Wesley now contends that aggravators two and four were improperly submitted to the jury.

### a. *Aggravating circumstance number two*

Even if aggravator number two was erroneously submitted to the jury, we conclude the submission was harmless error. The jury did not find aggravator two present in the killing of either Ike or Doella. Accordingly, aggravator two did not contribute to Wesley's sentence.

### b. *Aggravating circumstance number four*

Wesley contends that the depravity of mind aggravator was improperly given to, and considered by, the jury. The depravity of mind aggravator applies in capital cases if "torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself" is shown. *Robins*, 106 Nev. at 629, 798 P.2d at 570.

We conclude that sufficient evidence showed that Wesley tortured and inflicted serious and depraved physical abuse on his father and stepmother beyond the act of killing itself. Ike was stabbed eighteen times. Jordan testified that Ike's skull was chipped by the force of various stab wounds. Doella's thirty-six stab wounds covered her body. Accordingly, we conclude that the depravity of mind aggravator was properly submitted to the jury. *See* Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989) (holding depravity of mind aggravator was sustainable where two victims were stabbed multiple times, but reversed sentence due to jury's consideration of other improper aggravators); Williams v. State, 103 Nev. 227, 737 P.2d 508 (1987) (finding depravity of mind present where victim was stabbed thirty-eight times and coroner testified that evidence of torture was present).

### 2. *Depravity of mind instruction*

As to aggravating circumstance number four, Wesley challenges the sufficiency of the instruction that defined a murder involving torture, depravity of mind or the mutilation of the victim. The district court gave the following instruction to the jury:

### INSTRUCTION NO. 11

The condition of mind described as depravity of mind is

characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.

To find an aggravating circumstance based on depravity of mind you must additionally find that there was torture, mutilation, or other serious and depraved physical abuse beyond the act of killing itself.

Jury instruction number twelve provided a series of facts that the jury had to find before concluding that torture was present. Jury instruction number thirteen defined mutilate. The jury returned a special verdict indicating that they found the "murder involved torture, depravity of mind or the mutilation of the victim." Wesley challenges the sufficiency of the instructions and the special verdict.

States wishing to impose the death penalty must limit the jury's discretion by providing clear and objective standards and specific and detailed guidance. Godfrey v. Georgia, 446 U.S. 420, 428 (1980). Also, states must make the process for imposing the death penalty rationally reviewable. *Id.* These principles are intended to minimize the risk "of wholly arbitrary and capricious action." Lewis v. Jeffers, 497 U.S. 764, 774 (1990). Further, the sentencing scheme must narrow the class of persons eligible for the death penalty by providing a sensible basis for the sentencer to distinguish between defendants who deserve the death penalty and those who do not. Arave v. Creech, 507 U.S. 463, 474, 113 S. Ct. 1534, 1542 (1993).

This court has narrowly construed NRS 200.033(8), the depravity of mind aggravator, to include torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself. *Robins,* 106 Nev. at 629, 798 P.2d at 570. In *Robins,* we ruled that the inclusion of torture, mutilation or other serious and depraved abuse beyond the act of killing in a finding of depravity of mind effectively channels the sentencer's discretion. *Id.*

We conclude that the instructions offered in this case satisfied the requirements of *Godfrey* and *Robins.* The jury was required to find torture, mutilation or excessive abuse beyond the act of killing in order to find depravity of mind. Torture and mutilation were described in separate instructions. Accordingly, we conclude that the jury's discretion was sufficiently narrowed. *See Robins,* 106 Nev. at 629, 798 P.2d at 570.

Wesley also challenges the special verdict form used by the jury because its disjunctive format did not reveal whether the jury found torture, mutilation *or* excessive abuse beyond the act of killing. A similar challenge was rejected in Neuschafer v. State, 101 Nev. 331, 705 P.2d 609 (1985). In *Neuschafer,* we ruled that such language in a jury form is not unconstitutionally vague because the jury was fully instructed as to the definitions of torture and depravity of mind. *Id.* at 336 n.2, 705 P.2d at 612 n.2. Here, the jury was also fully informed as to the definitions of torture and depravity of mind.

3. *Nevada's death penalty statute*

At the time of Wesley's trial, Nevada's death penalty statute, found at NRS 200.030(4), stated:

> Every person convicted of murder of the first degree shall be punished:
>
> (a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.
>
> (b) Otherwise, by imprisonment in the state prison for life with or without the possibility of parole. . . .

The district court instructed the jury pursuant to NRS 200.030(4). Wesley contends that NRS 200.030(4) and the district court's instruction unconstitutionally shift the burden of proof and persuasion to the defendant by requiring the defendant to present mitigators that outweigh the aggravating circumstances. We rejected a similar claim in Bennett v. State, 106 Nev. 135, 144, 787 P.2d 797, 802-03, *cert. denied,* 498 U.S. 925 (1990). The *Bennett* court stated that the defense is not required to present mitigating factors under Nevada's statute because imposition of the death sentence by the jury is permissive. *Id.* at 144-45, 787 P.2d at 803. As the district court instructed the jury during Wesley's trial, "[t]he jury *may* impose a sentence of death if . . . at least one aggravating circumstance has been established . . . and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstances or circumstance found." (Emphasis added.) Accordingly, Wesley was not required to establish any mitigating circumstances in order to avoid being sentenced to death. *Bennett,* 106 Nev. at 144-45, 787 P.2d at 803; *accord* Proffitt v. Florida, 428 U.S. 242 (1976) (upholding a similar death penalty statute).

### 4. *Mandatory enhanced sentence*

Jury instruction number five stated that if Wesley was sentenced to life imprisonment with the possibility of parole, he would serve at least twenty years in prison before he would be eligible for parole. The district court denied Wesley's request to instruct the jury that the "use of a deadly weapon" enhancement would automatically double any sentence the jury issued. A district court may inform a jury of the potential date of parole for a defendant, but the court must do so accurately. Kazalyn v. State, 108 Nev. 67, 78, 825 P.2d 578, 585 (1992). A person sentenced to life imprisonment with the possibility of parole for first degree murder is eligible for parole after ten years. NRS 200.030(4)(b). The use of a deadly weapon results in a mandatory sentence enhancement equal to the original sentence. NRS 193.165(1). Accordingly, a defendant like Wesley who is sentenced to life imprisonment with the possibility of parole for first degree murder with the use of a deadly weapon is eligible for parole after twenty years. *Kazalyn,* 108 Nev. at 77-78, 825 P.2d at 585. Accordingly, the instruction given by the district court properly stated that Wesley would be eligible for parole after at least twenty years if the jury sentenced him to life imprisonment with the possibility of parole.

### 5. *Jury instruction number five*

Jury instruction number five also discussed the issue of commutation of a sentence of life imprisonment without the possibility of parole. Wesley contends that the instruction violates the United States and Nevada Constitutions. A district court may instruct a jury during a capital penalty hearing to consider possible commutation of a sentence. California v. Ramos, 463 U.S. 992, 1001 (1983). The *Ramos* Court concluded that such an instruction is relevant to the sentencing decision because it allows the jury to consider whether the defendant is a desirable candidate for return to society in the future. *Id.* at 1005. Further, " '[a]n instruction that discusses parole in a murder case is proper if the jury is not misled and so long as it does not enlarge upon the matter of parole.' " *Petrocelli,* 101 Nev. at 57, 692 P.2d at 511 (quoting Summers v. State, 86 Nev. 210, 213, 467 P.2d 98, 100 (1970)). In fact, instruction number five is mandated by the *Petrocelli* decision. *Id.* at 56, 692 P.2d at 510-11. Accordingly, we conclude that jury instruction number five was properly offered regarding the commutation process.

### 6. *Antisympathy jury instruction*

Over Wesley's objection, the district court instructed the jury that "[a] verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with the rules of law." Wesley contends that the district court's instruction violated his right to present, and to have the jury consider, any relevant mitigating evidence regarding his character, record, and the circumstances of the offense. A district court may instruct the jury not to consider sympathy during a capital penalty hearing, as long as the court also instructs the jury to consider mitigating factors. *Lay,* 110 Nev. at 1195, 886 P.2d at 451-52. In the present case, the district court instructed the jury to "consider any aspect of the defendant's character or record and any of the circumstances of the offense that the defense proffers as a basis for a sentence less than death." Accordingly, we conclude that the district court's antisympathy instruction was proper. *Id.; accord* Saffle v. Parks, 494 U.S. 484, 492-93 (1990).

### 7. *Victim impact evidence*

Robert Gaines testified during the penalty hearing that he had grown up with Ike, attended the same church, and respected Ike as a friend and a father-figure. Blood testified that she knew Ike and Doella for ten years, considered them to be like her parents and was hurt by their absence in her life. Walker, Ike's neighbor for roughly twenty-seven years, testified that Ike provided him with advice and helped him become a deacon at their church. Wesley asserts that the testimony of these three witnesses denied him a fair and impartial sentencing proceeding.

Questions regarding the admissibility of evidence during the penalty phase of a capital trial are left to the discretion of the trial court and will not be disturbed absent an abuse of discretion. Smith v. State, 110 Nev. 1094, 1106, 881 P.2d 649, 656 (1994); *see* NRS 175.552(3). According to the United States Supreme Court's holding in Payne v. Tennessee, 501 U.S. 808, 823 (1991), the admission of victim impact evidence during a capital penalty hearing does not violate the Eighth Amendment and is relevant to show each victim's "uniqueness as an individual human being." Further, this court has held that individuals outside the victim's family can present victim impact evidence. Lane v. State, 110 Nev. 1156, 1166, 881 P.2d 1358, 1365 (1994).

Wesley contends that the *Payne* Court did not condone the admission of victim impact evidence from neighbors, co-workers

and any other well wishers the State could find. Further, Wesley asserts that the use of such efforts violates the mandates of *Godfrey* which require specific and detailed guidance to the jury to prohibit the arbitrary application of the death penalty. We conclude that the admission of Blood's, Walker's, and Gaines' testimony did not violate Wesley's Eighth Amendment rights. Each witness's testimony was relevant to the impact of Wesley's actions. *See Lane,* 110 Nev. at 1166, 881 P.2d at 1365. The evidence provided the jury with the individualized circumstances present in Ike's and Doella's lives, and the specific harm caused by the crime charged, helping the jury make the individualized sentence required by the Eighth Amendment. *Payne,* 501 U.S. at 825.

## CONCLUSION

Having thoroughly reviewed all Wesley's contentions, we conclude they are without merit. Also, we conclude that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor and is not excessive, considering both the crime and the defendant. Accordingly, we affirm Wesley's judgment of conviction and sentence.