951 P.2d 1047 (1997)
Avram NIKA, Appellant,
v.
The STATE of Nevada, Respondent.
No. 27331.
Supreme Court of Nevada.
December 30, 1997.
*1048 Michael R. Specchio, Public Defender, and John Reese Petty, Chief Appellate Deputy, Washoe County, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City, Richard A. Gammick, District Attorney, and Terrence P. McCarthy, Deputy, Washoe County, for Respondent.

OPINION
YOUNG, Judge:
Appellant Avram Nika ("Nika") left Aptos, California, where he lived with his wife Rodika, between noon and 1 p.m. on August 26, 1994, and was traveling to Chicago so that he could fly from there to Romania to visit his sick mother. Nika's car was full of clothes, tools, electronic items, and a small television. According to Rodika, Nika was from Romania and spoke fluent Serbo-Croatian, spoke almost fluent Romanian, and spoke only broken English. Rodika also stated that Nika did not speak colloquial English and that she had to be present when he had dealings with merchants, government officials, and other people. Nika was driving a brown Chrysler New Yorker, and testimony indicated that it takes approximately five and one-half hours to drive from Aptos to Reno. Nika's car broke down at mile marker 34, approximately twenty miles east of Reno.
Edward Smith ("Smith") was employed as a manager at a Burger King in Reno. Smith left work to go home at approximately 8 p.m. to 8:10 p.m. on August 26, 1994. The Smith *1049 family lived in Fallon, and Smith had made plans with his wife and child to attend a movie that started at approximately 9:45 p.m. Smith drove a silver 1983 BMW, and Mrs. Smith testified that the BMW often would not start, that they had to push start it, and that they had recently bought a new battery for the BMW in July 1994. Testimony indicated that it takes approximately one hour to one hour and fifteen minutes to get from the Burger King in Reno to the Smith's home in Fallon and that it takes approximately forty to forty-five minutes to get from the Burger King to mile marker 34.
Several people saw Nika standing by his car at mile marker 34 on August 26, 1994.[1] Edward Sanchez was driving a maroon Nissan Sentra and was flagged down by Nika at approximately 7:45 p.m. Sanchez pulled his car in front of Nika's and backed up toward the brown Chrysler. Nika approached Sanchez's passenger window and said his car had broken down and that he needed help. Sanchez got out of his car and attempted to find out what was wrong with Nika's car. Sanchez stated that Nika had a thick accent, strong body odor, a day's beard growth and wore blue cut-off jeans. Sanchez offered to give Nika a ride, but Nika could not decide if he wanted to accept the ride and instead had Sanchez call a tow truck for him. Sanchez stated it was shortly after 8 p.m. when he got back into his car, perhaps 8:02 p.m. Sanchez stopped at a truck stop in Fernley and asked one of the clerks to call a tow truck for Nika.
Davina Boling was driving with her boyfriend on I-80 and saw the brown Chrysler on the side of the road around 8:30 p.m. They pulled over to help Nika, whom Boling described as looking frustrated, and Nika told them he had been there for three or four hours and needed a tow truck. They offered him a ride, which he declined, but he requested that they call a tow truck for him. As they left, Nika told them "Good-bye. Thank you, God bless."
Debra Fauvell ("Debra") stated that at approximately 8:40 p.m. she and her husband passed mile marker 34. She stated that she saw two cars on the side of the road, the first was a tan or light colored, four-door sedan which did not have any lights on and which had both driver's side doors open. About 150 feet in front (east) of the tan car she saw a dark brown sedan-type car with its hazard lights on. She saw two people standing by the first (most westerly) car. The person standing by the rear passenger side of the first car had a medium build, was about five feet ten inches tall, and was wearing a white T-shirt and light colored, faded jean-type pants. The second person was twenty feet in front of the first person, was bigger and had bushier hair than the first person, and was walking in a southeasterly direction away from the cars. Debra was shown a picture of Smith and stated that the second man's stature was consistent with Smith's. Daniel Fauvell, Debra's husband, testified that he was driving the car. He stated that he was focused on driving and did not see much, but the first car that they passed did not have any lights on, the second car had its hazard lights on, and one person was standing next to the first car.
Trooper Terry Whitehead of the Nevada Highway Patrol testified as follows. He came into contact with Nika while patrolling the highway on August 26, 1994. Whitehead was traveling westbound on I-80 when he saw a stranded BMW on the eastbound *1050 shoulder with its hazard lights on. He made a U-turn across the highway and went to help the stranded motorist. As Whitehead approached the BMW, he passed a brown Chrysler with no lights on. Because the Chrysler had no lights on, the hood was not open, and nobody was in the car, he drove further and pulled behind the BMW. The dispatch log indicates that he ran a license plate check on the BMW at 8:51 p.m. (the license plate was a Nevada plate), and he also looked at the BMW to see if it had indications that it was stolen. There were no people or items of personal property in the BMW. Because the dispatcher did not return his inquiry, he assumed that the BMW was not stolen and started to back up to check out the Chrysler, which was about 400 feet behind (west of) the BMW. As Whitehead backed up, he saw someone waving a flashlight from a southeasterly direction apparently trying to get his attention. The flashlight was coming from the area where Smith's dead body was found the next day. Whitehead got out of his car and asked Nika what was wrong with his car; Nika pointed to the BMW and stated, "Everything's wrong with it." Whitehead asked Nika if he needed a ride. Nika declined and instead asked for a tow truck. Whitehead said he would call one and asked Nika if there was anything else he could do for him. Nika stated he could use a ride to Chicago. Whitehead stated he did not patrol that far. At 8:53 p.m. Whitehead requested a tow truck for Nika. Whitehead stated that Nika was wearing white high-top tennis shoes and did not seem more nervous than any other person who had been stranded at night on the side of the road. He also stated that he did not see any blood on Nika's shoes or fanny pack and that he never asked Nika his name. Whitehead left the scene at 8:56 p.m. to answer a call for back-up assistance on a DUI case.
Karl Younger testified for the defense. He stated that he worked for Anderson Towing and received a call at his home in Reno on August 26, 1994, at 8:45 p.m. requesting tow truck assistance at mile marker 34 for a Chrysler New Yorker.[2] At approximately 9:15 p.m., Younger saw the Chrysler and backed up toward it to prepare to tow it, at which time he noticed two other cars about sixty yards in front of (east) the tow truck. The first car in front of Younger was a silver BMW with out-of-state license plates and its lights on. The second car, a blue or brown Nissan or Datsun which also had its lights on, was in front of the first car. As he backed up to the Chrysler, two people approached the tow truck and told him that the Chrysler needed oil, that they had taken the driver to town to get the oil, and that the tow truck was no longer needed. Neither of these two men spoke with a thick accent and both spoke perfect English. Younger also noticed five to seven other people with flashlights in the area where Smith's body was eventually found. Younger then left the scene.
Loni Kowalski testified that she worked at Hanneman's Tow Service and received a call at 8:53 p.m. from the Highway Patrol requesting a tow truck for a silver BMW. At 8:57 p.m. she called Jerry Turley, an employee who was on call but at his own home, to tell him to respond to the request. Turley testified that he drove west from Fernley toward mile marker 34, looking on both sides of the highway for the silver BMW. He did not see the BMW and called Kowalski to inform her of such. Kowalski told Turley to keep looking, and Turley eventually saw two cars on the eastbound shoulder, exited the freeway and reentered going eastbound, and put his flashers on as he arrived at the two cars. He noticed that neither car was a silver BMW, turned his flashers off, and called Kowalski at 9:49 p.m. to tell her that he could not find the BMW. Turley stated that one car was a large dark car that could have been a Chrysler and that the other car was a smaller domestic car, like a Mercury Monarch or Ford Granada, which had its flashers on. He saw two people standing by the Chrysler but could not describe them.
On August 27, 1994, Ray Hansen, a brakeman for Southern Pacific Railroad, noticed what he thought was a body lying next to the fence between the railroad tracks and I-80. The police were called, and a trooper found the body. Careflight was also called because *1051 it was first believed that a motorcycle accident had occurred and that medical attention was required. The Careflight helicopter landed approximately fifteen to fifty feet from the body, and the medics checked the body and discovered that the person was dead.
David Billau was the crime scene investigator. He stated that the Careflight helicopter which landed near the crime scene could have disturbed the crime scene. He described the crime scene as follows: the Chrysler was parked off the shoulder of the eastbound lane of I-80; south of the car was a small hillside; south of the hillside was a barbed wire fence under which Smith's body was dumped; and south of the fence and body were the railroad tracks. Drag marks in the dirt extended from the Chrysler to where the body was found. By the Chrysler's rear passenger tire was a rock with pooled blood on it. By the front tire was an area of red stained dirt in which a bullet and human hair were found. A spent shell casing was found a few feet in front of the red stained dirt. Smith's body was found under the barbed wire fence and his pants were hanging from the fence. His wallet was found with money still in it lying next to his body. Smith had been shot in the forehead.
The police traced the brown Chrysler to Avram Nika and an address in Chicago. On August 29, 1994, the Washoe County Sheriff's office called the Chicago police for assistance in locating Nika. Chicago Police Detective Tony Villardita and his partner discovered several addresses for Nika and attempted to locate him. They saw Nika exit a silver BMW, and when they asked him his name, Nika gave them a false name. Based on this information they arrested Nika for possession of a stolen vehicle and read him his Miranda rights. Nika apparently told the police that he understood his rights and that he would waive those rights and speak to them.
Nika first denied any knowledge of the BMW and said that he had walked to his house. When the police told him that they saw him in the car and that they had found the car key in his pocket, Nika said that the car belonged to his friend, but that he did not know his friend's name. The police then told Nika that the BMW was involved in a murder outside Reno. Nika said that he had left Aptos in his Chrysler, arrived in Reno at around 2 p.m., went to a casino to eat, and when he came out of the casino his car was gone but his license plates were still there. At that point three males pulled up and offered to sell the BMW to him for $300.00. He took the offer, put his plates on the car, and drove to Chicago. He also stated that he made no other stops in Reno and that the car had no mechanical problems.
The police then told Nika that the BMW was seen on the side of I-80, and Nika then said that the BMW had an oil and antifreeze problem about thirty miles east of Reno, several people stopped to help him, and he eventually got the car restarted. Nika said that he did not see his stolen Chrysler where the BMW broke down. The police told him that witnesses had seen both cars on the side of the road. Nika then told the police that he was "ready to tell the truth," and he said that he left the casino in his Chrysler and had car problems about thirty miles east of Reno. He said several people stopped to help him, and then the same three males he described earlier stopped to help him and offered to sell him the BMW for $300.00. He bought the car, changed the license plates, and loaded his personal property into the BMW. Nika also stated that just as he was ready to leave and while the three males were still at the scene, a police officer stopped to help him. Nika told the officer that the BMW was experiencing problems but that he was able to start it, and then he drove to Chicago. Nika also stated that he went to his mother-in-law's garage in Chicago to unload his personal property, drove to get something to eat, and then was arrested by Villardita and his partner. After this questioning was conducted, John Yaryan ("Yaryan"), the Washoe County Sheriff's deputy who had flown to Chicago, questioned Nika. However, the district judge suppressed this statement based on the fact that Nika had invoked his right to remain silent and his right to counsel and that Yaryan continued to question Nika at length. The *1052 State has not argued that the suppression was improper.
The police obtained consent to search the garage of Nika's mother-in-law. They found a fanny pack, tennis shoes, and blue denim cut-off jeans, all of which were tested by forensic investigators. The forensic investigators found blood spatter on all three items, and DNA testing indicated that the blood was consistent with that of Smith and excluded Nika as a source. The forensic investigators stated that at a minimum, 1 in 8,800 people had the same DNA pattern they discovered.
Nika was extradited from Chicago to Reno and was booked into Washoe County jail on September 1, 1994. During Nika's incarceration, Nathanial Wilson ("Wilson"), an inmate at the Washoe County jail, befriended Nika. Wilson testified to statements made by Nika regarding the events on I-80. Specifically, Nika told Wilson that his car had broken down, a man stopped to help him, the man called him a "motherf____," he hit the man in the head with a crowbar, and then shot him in the head. Nika stated that in Romania, his country of origin, you did not use the word "motherf____," and that you could be killed for calling somebody that name. Nika stated that the victim was lying on the ground when he was shot in the head, that he tried to hide the body in some bushes, and that he killed the man because "he needed to get to Chicago." Nika stated that he hid the gun, which was an automatic pistol, about five miles from the crime scene. (The gun was never found despite an extensive search.) Nika told him that he had taken the battery out of his car and put it in the BMW because the BMW would not start.[3]
Wilson was in jail on one count of selling cocaine and stated that he did not receive any deal from the prosecution in exchange for his testimony. However, Wilson spoke to the police for the first time on October 11, 1994, and was released from jail and granted probation on November 18, 1994, after pleading guilty to what he called "possession for sale," a lesser crime than that with which he was originally charged.
Dr. Anton Sohn ("Dr. Sohn") conducted the autopsy on Smith. He found three blunt trauma wounds on the back of Smith's head where Smith had been hit with an object heavy enough and with enough force to fracture the skull beneath each wound. Dr. Sohn testified that at least one of the blunt trauma wounds was delivered to the skull while Smith was lying on the ground face down. On Smith's forehead was a bullet wound which Dr. Sohn classified as a "contact wound," stating that it was created when the muzzle of the gun was placed directly against the forehead and the gun was fired. Dr. Sohn found an exit wound in the back of Smith's head and found other lacerations on Smith's face. Dr. Sohn found scrapes or "drag marks" on Smith's chest which were consistent with Smith's body being dragged in the dirt. Dr. Sohn stated that the gunshot to the head was the cause of death and that the blunt force traumas were inflicted before Smith was shot.
At the conclusion of the trial, the jury found Nika guilty of first degree murder with the use of a deadly weapon. At the penalty hearing, the prosecution sought the death penalty and alleged three aggravating circumstances as follows:
1. Evidence that the murder was committed by AVRAM NIKA during the commission of or attempt to commit a robbery. NRS 200.033(4).
2. Evidence that the murder was committed to avoid or prevent a lawful arrest. NRS 200.033(5).
3. Evidence that the murder was committed upon one or more persons at random and without apparent motive. NRS 200.033(9).
Anna Boka ("Anna"), Nika's mother-in-law, testified at the penalty hearing as follows. Nika had a violent temper, and in 1991 when she did not give Nika money for a trip, he threatened to kill both her and Rodika, Anna's daughter and Nika's wife. Peter *1053 Boka ("Peter"), Anna's husband, told Anna that in September 1993 he and Nika had gotten into an argument and Nika put a gun to Peter's head. (Peter later testified that he never saw a gun and that Nika only threatened to shoot him.) Anna stated on cross-examination that Peter was a very heavy drinker and had instigated the fight in September 1993. In October 1993, Nika stated that he would kill Anna if Rodika did not come back to live with him. Also in October 1993, Nika wanted to see his and Rodika's baby who was staying at Anna's house, but Peter refused to allow Nika in the house. At that point Nika flashed a gun and told Anna that if Peter did not let him see the baby, he would kill Peter. Finally, in November 1993, Nika told Anna that if Rodika did not leave Anna's house in Chicago and come back to him, he would burn down Anna's house.
Mary Ellen Izzo testified that Nika had raped her in an apartment building in Chicago in December 1989. She stated that he was helping people move into or out of the building, that she met him in the hallway, and that he later told her that his mother, who was the manager of the apartment, wished to see her.[4] She went into the manager's apartment with Nika and he locked the door and told her to come into the bedroom because that was where his mother was. When she was in the bedroom, Nika pushed her on the bed, hit her, and sexually penetrated her. Izzo escaped after Nika let her up, and she then called the police. Nika was never prosecuted for the alleged crime, and Izzo stated that she did not proceed with the prosecution because Nika's aunt threatened to evict her if she proceeded, she had three children to take care of, and she did not have enough money to move. Izzo stated on cross-examination that she had bruises on her face and breasts as a result of the rape; however, a hospital report indicated that she had only red marks on her neck. The defense attorney asked Izzo if she was a drug user, and Izzo stated that she was not. Izzo stated that shortly after this event she received government housing and moved.
Rodika, Nika's wife, testified for the defense as follows. In reference to the alleged sexual assault, Izzo had approached Rodika's family and stated that if they did not want to see Nika jailed for rape, they had better pay her some "big money." She had heard that Izzo had a drug problem and had hung her children out of her second story window. In reference to the September 1993 incident between Nika and Peter, the police were called, and they never found a gun. She acknowledged on cross-examination that Nika was violent and had made death threats against her and her family on several occasions.
Dorina Vukadin, Rodika's sister, also testified for the defense. She stated that Nika played sports with her children and that her children liked Nika, but she also stated that he was a stern disciplinarian.
On July 10, 1995, the jury found beyond a reasonable doubt that the murder committed by Nika was aggravated by the fact that the murder was committed upon Smith at random and without apparent motive. The jury also found that no mitigating circumstances existed.[5] Consequently, the mitigating circumstances did not outweigh the aggravating circumstances found; and therefore, a sentence of death was imposed.
Nika now challenges both his conviction and sentence of death in this direct appeal.

*1054 1. Sufficiency of the evidence

Nika argues that he was convicted upon suspicion alone and that insufficient evidence existed to support his conviction. The prosecution argues that the evidence proved beyond a reasonable doubt that Nika killed Smith. The standard of review for sufficiency of the evidence upon appeal is whether the jury, acting reasonably, could have been convinced of the defendant's guilt beyond a reasonable doubt. Kazalyn v. State, 108 Nev. 67, 71, 825 P.2d 578, 581 (1992).
The State's theory of the case was that Smith left work at approximately 8 p.m. and arrived at mile marker 34 at approximately 8:40 p.m. At approximately 8:40 p.m., the Fauvells saw two men at mile marker 34 by the brown Chrysler, that the BMW had no hazard or dome lights on, even though one of the doors was open, and that the BMW was parked behind (west of) the Chrysler. At approximately 8:51 p.m., Nevada Highway Patrol Trooper Terry Whitehead arrived at the scene, did not see Smith, noticed that the BMW had its hazard lights on and the brown Chrysler did not have any lights on, and the BMW was parked in front of (east of) the Chrysler. Whitehead also noticed that Nika was walking toward him from the direction of where the body was found. Nika told Whitehead that his car, the BMW, was experiencing trouble and that he needed a tow. The State's theory was that when Whitehead arrived at the scene at 8:51 p.m., Nika had already killed Smith, dragged his body to the fence, and transferred the battery from the Chrysler to the BMW so that he could drive the BMW to Chicago. Wilson's testimony supported this theory because he testified that Nika told him he had killed Smith after Smith called him a "motherf____," and that after he killed Smith and hid his body, he took the battery out of the Chrysler and put it into the BMW. The BMW was found in Chicago with a different brand of battery than the Smiths had put into the car. Additionally, the car was found in Illinois with Illinois license plates on it.
Other evidence which supports the State's theory is that when Nika was arrested in Chicago, he told the police five or six different versions of the events that occurred on I-80. Also, blood spatter consistent with Smith's blood was found on the top of Nika's shoes, the inner thigh portion of his pants, and on his fanny pack. This evidence, along with the angled path of the bullet through Smith's skull, supports the State's theory that Nika stood over Smith, who was then face up, pressed the gun up to Smith's forehead, and pulled the trigger. Furthermore, Wilson testified that Nika confessed to hitting Smith in the head with a crowbar and shooting him in the head, and Dr. Sohn confirmed that Smith's body was in that condition when it was discovered. Finally, Colleen Villa, a Washoe County Sheriff working in the intake department at the county jail, testified that Nika told her that he had assaulted a man around 9 p.m. and that the man was dead. We conclude that based on this evidence, a jury, acting reasonably, could have been convinced of Nika's guilt beyond a reasonable doubt.[6]

2. Constitutionality of NRS 200.033(9)

A state that wishes to authorize capital punishment has a constitutional responsibility to tailor its law in a manner which avoids the arbitrary and capricious infliction of the death penalty. Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980). The United States Supreme Court makes clear that a death penalty system will be unconstitutional if it has "`standards so vague that they would fail adequately to channel the sentencing decision patterns of juries [resulting in] a pattern of arbitrary and capricious sentencing.'" Id. at 428, 100 S.Ct. at 1765 (quoting Gregg v. Georgia, 428 U.S. 153, 195 n. 46, 96 S.Ct. *1055 2909, 2935 n. 46, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).
Nika contends that NRS 200.033(9) is unconstitutional because it fails to "genuinely narrow the class of persons eligible for the death penalty. . . ." Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Nika's claim fails to raise an issue not previously addressed by this court in its numerous other opinions upholding the constitutionality of NRS 200.033(9). See, e.g., Lane v. State, 110 Nev. 1156, 881 P.2d 1358 (1994); Paine v. State, 110 Nev. 609, 877 P.2d 1025 (1994), cert. denied, 514 U.S. 1038, 115 S.Ct. 1405, 131 L.Ed.2d 291 (1995); Bennett v. State, 106 Nev. 135, 787 P.2d 797 (1990); Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987); Ford v. State, 102 Nev. 126, 717 P.2d 27 (1986). Accordingly, we decline to revisit this issue once again.

3. Evidence supporting NRS 200.033(9)

NRS 177.055(2)(b) requires this court to examine the record on appeal when determining whether evidence supports the finding of an aggravating circumstance. Nika contends that the death sentence must be set aside because the evidence did not support the aggravating circumstance enumerated in NRS 200.033(9). The prosecution avers the opposite.
The jury concluded that Smith's murder was aggravated by the fact that the murder was committed upon Smith "at random and without apparent motive" pursuant to NRS 200.033(9). The jury did not find any mitigating circumstances.
This court previously considered cases where the aggravating circumstance at issue was that stated in NRS 200.033(9). In Bennett v. State, 106 Nev. 135, 787 P.2d 797 (1990), Bennett entered a convenience store, laid a piece of candy on the counter, and shot the clerk in the face as she rang up his purchase, killing her instantly. Bennett then jumped over the counter and attempted to open the cash register. Id. at 137, 787 P.2d at 798. This court concluded that because the killing was not necessary to accomplish the robbery or burglary, the jury's finding that Bennett killed without an apparent motive was supported by substantial evidence. Id. at 143, 787 P.2d at 802.
In Paine v. State, 107 Nev. 998, 823 P.2d 281 (1991), Paine and an accomplice shot, killed, and robbed one taxi cab driver and then shot and robbed a second taxicab driver who did not die. At his penalty hearing, Paine stated that there was no reason for him to have pulled the trigger in either case. Id. at 1000, 823 P.2d at 282. Paine was sentenced to death after the jury found two aggravating circumstances, one of which was that the killing was random and without apparent motive. This court reasoned that sufficient evidence existed to conclude that the killing was random and without motive because the robbery could have been completed without killing the victim. Id. at 999-1000, 823 P.2d at 282. This court applied the same reasoning to uphold death sentences in Lane v. State, 110 Nev. 1156, 881 P.2d 1358 (1994), and Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987).
In the instant case, the jury was instructed at the penalty hearing that "[a] murder may be random and without apparent motive if the killing of a person was not necessary to complete a robbery." Although Nika was not formally charged with the crime of robbery,[7] the jury was provided with an instruction defining robbery. When taken in conjunction, these instructions required the jury to consider whether Nika needed to murder Smith in order to rob him of his automobile and continue on to Chicago. We conclude that the evidence presented at trial provides ample support for the jury's finding that Nika acted at random and without apparent motive.
Dr. Sohn testified that Smith was struck three times in the back of the head causing blunt-force trauma wounds. While none of the blows was independently capable of causing death, they were sufficiently traumatic to render Smith incapacitated. In fact, Dr. Sohn testified that each blow fractured Smith's skull. One blow knocked him to the *1056 ground, and at least one of the blows was delivered with Smith's head already face down in the dirt and rocks. The jury could have then reasonably inferred that Nika turned Smith over, face up, and without resistance, placed the gun barrel against Smith's forehead and administered the fatal gunshot wound. Dr. Sohn's interpretation of the forensic evidence is corroborated by Wilson. Wilson testified that Nika stated he struck Smith multiple times with a crow bar. These blows knocked Smith to the ground. As Smith lay on the ground, Nika put the gun to Smith's forehead and fired.
This testimony supports the jury finding that Nika did not need to kill Smith in order to take his car. Smith was struck three times in the back of the head with a crow bar. Each blow fractured his skull. In all likelihood, Smith was either unconscious or semi-conscious as he lay on the ground. Therefore, it would be reasonable to conclude that Smith was in no condition to prevent Nika from robbing him of his automobile.[8]
Further support for the finding that the murder was committed at random and without apparent motive can be found in the fact that Smith's wallet and money were found next to his body. Thus, robbery was not a likely motive for the killing.
Additionally, Trooper Whitehead apparently came upon Nika after Smith had been killed and his body dragged to the barbed wire fence. Nika pointed to the BMW and acted as if it were his own, but, nevertheless, asked Whitehead for a ride to Chicago. This lends support to the contention that Nika's motivation to kill Smith was not to take the BMW. Nika was apparently ready to leave the scene in any manner possible, including with a State trooper. Accordingly, the evidence supports the aggravating circumstance embodied in NRS 200.033(9).

4. Custodial interrogation

The dissent finds issue with the district court's determination that no custodial interrogation of Nika occurred. However, after a thorough review of the record and listening to oral argument from Nika's counsel, we conclude that the district court did not err in its determination.
On September 1, 1994, after being extradited to Nevada from Illinois, Nika was booked into the Washoe County jail. The following day, Washoe County Deputy Colleen Villa called Nika aside. Villa worked in the county jail's classification unit and it was her job to place prisoners in an environment where they did not present a danger to themselves or others. To facilitate the placement process, Villa asked every prisoner a series of questions from a pre-printed questionnaire. One of the questions on the form was, "Have you ever assaulted or battered anyone?" When Villa asked Nika this question, he answered that he had fought with a man one evening around 9 p.m. or 9:30 p.m. and that the man was dead. Nika also stated that a gun was placed to a head, but Villa was unsure of who placed the gun to whose head. Nevertheless, Villa did not pursue the answer nor ask for a clarification from Nika. She merely continued down the list of questions on the form.
The dissent contends that because Villa knew Nika was arrested for murder, she would reasonably foresee the questionnaire would elicit an incriminating response from Nika; and therefore, she engaged in a custodial interrogation by merely reading the questionnaire. Taken a step further, if Villa knew nothing about Nika, the exact same question would not be a custodial interrogation under this analysis. We find this factual distinction unpersuasive. Villa asked the same questions of every prisoner. Villa testified she never asked for clarification from a prisoner nor did she do anything other than move on to the next question. Interestingly, when Nika's counsel was questioned as to why this issue was not raised on appeal, he stated Nika conceded it was merely routine *1057 questioning for the purpose of classification and not a custodial interrogation.
Moreover, the safety of prisoners in custody is the purpose behind these questions. There is no getting around this type of question when trying to determine the threat, if any, a particular prisoner may pose to another. While the State can control many things, it cannot control what a prisoner might say when asked a particular question. Therefore, the district court did not err in determining that no custodial interrogation occurred.

5. Excessiveness of death sentence

NRS 177.055(2)(d) requires this court to review "[w]hether the sentence of death is excessive, considering both the crime and the defendant." We conclude that the imposition of the death penalty was not excessive.
Smith was brutally struck in the head three times with such force that each blow fractured his skull. Dr. Sohn testified that when Smith was shot in the head, he was probably lying on his back and that the gunshot wound was the cause of death because each of the blunt trauma wounds was not independently fatal. The way that the murder appears to have occurredthree blows to the head and then the gun placed directly on Smith's forehead and fired as he lay on the groundwas of such a heinous and gruesome nature that the imposition of the death penalty was not excessive. See Doleman v. State, 107 Nev. 409, 418, 812 P.2d 1287, 1293 (1991).

6. Passion or prejudice influencing death sentence

NRS 177.055(2)(c) requires this court to review "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor." Nika argues that the jury's rejection of any mitigating factors demonstrates that the sentence was imposed under the influence of passion and prejudice. The prosecution argues that the jury's failure to find any mitigating factors resulted from the fact that no mitigating evidence was produced at the sentencing hearing. We conclude that the jury's failure to find any mitigating factors does not prove it acted under the influence of passion or prejudice.
The only mitigating evidence produced by Nika came from his family members, and that testimony was very limited. Rodika, Nika's wife, testified that she believed that Nika was generally a good person, but she also admitted that Nika was violent and had threatened to kill her, her mother, and her father on separate occasions. Dorina Vukadin, Rodika's sister, also testified for the defense. She stated that Nika played sports with her children and that her children liked him, but also that he was a stern disciplinarian. She also stated that he sometimes exposed her children to violent movies and television programs. Anna, Nika's mother-in-law, testified for the prosecution, and her testimony was primarily concerned with Nika's death threats against her and members of her family. On cross-examination, the only positive statement she made regarding Nika was that Nika and Rodika's child loved Nika. We conclude, therefore, that the jury could reasonably have found that the mitigating circumstances did not outweigh the aggravating circumstances and that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor.
Accordingly, we affirm Nika's judgment of conviction and sentence of death.
SHEARING, J., concurs.
MAUPIN, Justice, concurring:
I concur. In seeking the death penalty, the State alleged three aggravating circumstances, to wit: (1) the murder was committed during the commission of or in an attempt to commit robbery; (2) the murder was committed to avoid or prevent lawful arrest; and (3) the murder was committed at random and without apparent motive. The dissent concludes that the failure of the trial jury to find in favor of the State on the first two alleged aggravators is inconsistent with its positive finding in connection with the third alleged aggravator. These verdicts are not, in my view, inconsistent.
*1058 In Bennett v. State, 106 Nev. 135, 137, 787 P.2d 797, 802 (1990), this court held that a murder could be committed during the course of a robbery and without apparent motive where the killing was not necessary to accomplish the underlying crime. If that is so, then the converse may certainly be true. If the jury was unable to conclude that a robbery did occur, but did conclude that Nika was guilty of first-degree murder, it could certainly conclude that the murder was committed at random and apparently motiveless. The jury was not compelled to believe any or all of the accomplice testimony regarding Nika's confession, including the portion thereof in which Nika claimed that the victim was shot after referring to Nika in the most insulting of pejorative terms. Also, the overwhelming evidence of Nika's perfidy when confronted by police upon his arrest in Chicago more than confirms a possible theory of criminality consistent with the third and last alleged aggravator.
To conclude, if a murder committed during the course of a robbery may, under Bennett, be committed at random and without apparent motive, a fortiori, a murder committed under circumstances not amounting to robbery can be found to have been without apparent motive. While the State did go to the jury on a theory that this murder was committed during the course of a robbery, the jury was certainly entitled under this information to conclude that a random and apparently motiveless murder had been committed while finding the evidence insufficient for any number of technical grounds to support, beyond a reasonable doubt, a finding that a robbery had occurred.
The ordinary use of the terms "random" and "without apparent motive," in the minds of a reasonable jury, could certainly fit the facts of this totally senseless act of homicide.
SPRINGER, Justice, dissenting:
The majority wrongly concludes that the evidence "supports the finding of . . . the aggravating circumstance enumerated in NRS 200.033(9)," namely, that the murder was committed "at random and without apparent motive." What the State's evidence does support is that Nika acted purposively and not randomly and that he was motivated to kill either out of anger at being called a "motherfucker" or because he wanted to rob his victim of the victim's car.
The only evidence in this case of the circumstances of this killing is the evidence presented by the State. From this evidence the jury learned that Nika, frustrated and angered by his car-breakdown, broke into a frenzied homicidal rage during which he, by his own admission, beat his victim with a crowbar and shot him in the head. Not a pretty sight, indeed, but not necessarily, under our law, a death penalty case.
As stated in the majority opinion, Nika was from Romania and spoke only broken English and certainly did not understand, other than in its literal sense, the epithet, "motherfucker." The evidence was that Nika had remarked that in his country using such an expression could result in the death of the name-caller. The most likely "apparent" motive to be derived from the State's case was Nika's extreme anger, evoked by his victim's insult to him and to his mother.
Anger, brought about by defending his mother's honor, is not the only possible or "apparent" motive in this case, however. Robbery is another "apparent" motive. The victim's wallet, with money in it, was found by the victim's side, so this was probably not a robbery of the person. Nika did decide, however, to take the victim's car after the killing. Although, taking the car appears to be more of an afterthought after the homicide and more likely a larceny than a robbery, robbery is surely, at least, an apparent motive. The jury, of course, concluded that this was not a robbery case (apparently believing that the car theft was an afterthought). If the jury had found a robbery, this finding would have been a valid aggravating circumstance, and there would be little difficulty in affirming the death penalty. The jury, however, did not find robbery as an aggravating circumstance; and the only aggravating circumstance in this case is Nevada's curious and unexampled "at random and *1059 without apparent motive."[1]
There are, of course, a number of possible "apparent" motives for Nika's killing his victim. Robbery is an "apparent motive"; but with the jury's rejection of this aggravating circumstance, the most probable motive for this killing (both real and "apparent") is that, given his cultural background, Nika could not countenance anyone's accusing him of having sexual relations with his mother. At least, this is what the State's evidence would have the jury believe. Still, the majority somehow concludes that Nika did not even have an "apparent" motive to kill. As far as I can tell, the majority has nothing to say in its opinion to support the completely insupportable, if not unthinkable, proposition that in the face of all of the State's evidence, Nika did not even have an ostensible or "apparent" motive to kill this particular victim.
The majority opinion maintains that because Nika did not "need[ ] to murder Smith in order to rob him . . . the evidence presented at trial provides ample support for the jury's finding that [Nika] acted at random and without apparent motive." However, in support of its conclusion that Nika acted without "apparent" motive, the majority goes on to state a non sequitur, that "robbery was not a likely motive for the killing." This statement is not only inconsistent with the State's theory, it is not true. The evidence presented at trial presents absolutely no evidence that Nika acted either at random or without apparent motive.
Once the majority decides (apparently because of the jury verdict) that robbery was "likely" not Nika's true motive, it fallaciously jumps to the conclusion that robbery could not be even an "apparent" reason for the crime. I would argue that even if robbery was not a "likely" motive, it surely could still be an "apparent" motive.
If I understand the majority opinion correctly, the majority justices are trying to say to us that if robbery was not a "likely motive," it cannot then be an "apparent" motive. The jury was not given a definition of "apparent." Presumably, the jurors relied on their common sense understanding of the word. "Apparent" refers to a possibility, that which is evident from the circumstances or that which appears to be real.[2] Of course robbery was, at the very least, an "apparent" motive for this killing. The State, itself, took the position that not only was Nika motivated to rob, he did in fact rob. Robbery was an apparent reason insofar as the State was concerned. Further, as pointed out by Justice Rose in his dissent, it is inconsistent and "improper for the State to argue during the guilt phase that Nika had acted with a motive and then argue in the penalty phase that Nika had acted without a motive."
Obviously, robbery becomes no less of an "apparent" motive either because the jury ultimately concluded that no robbery was committed or because the majority guesses that robbery was an "unlikely" motive. I am not suggesting, of course, that I, or anyone else, can truly say which of the possible "apparent" motives motivated Nika to kill this victim. All I am saying is that it approaches the nonsensical to propose that there was no "apparent motive" for this killing.[3]
*1060 Under the statute and the instruction given, to be guilty of this aggravating circumstance, not only must Nika have killed without any apparent motive, he must also have killed "at random." The majority cites cases to support its without-apparent-motive case but fails to discuss in any fashion the indispensable at random element of this aggravating circumstance.
The jury, of course, was given no definition of what the term "at random" means; and it was left to its own devices in defining the element of randomness. I agree with dissenting Justice Rose that it is "essential to define the term[ ] `random' . . . in order to give the jury guidance and `genuinely narrow the class of person eligible for the death penalty.'" Neither the majority nor concurring opinion gives any thought or attention to the meaning of the word "random." Unless there is evidence upon which a jury can properly find, beyond a reasonable doubt, that Nika acted in random manner, the requirements of this aggravating factor cannot be fulfilled.
In common parlance "random" means aimless and left to chance. This killing does not have the slightest hint of being either aimless or random. According to the State, it was a killing committed out of rage or motivated robbery, two real or "apparent" motives.
As noted, Nevada appears to be the only State that has provided for this odd aggravating circumstance. Presumably, it was intended to address the culpability inherent in unprovoked, uncalled-for killings of persons unknown to the killer. If, for example, a person were to fire a machine-gun "at random" into a crowd, not caring who the victims were, just wanting to kill someone, such a case would probably fall into the category of a random killing. We have nothing like that here. The only thing that we know about this killing is what was presented by the prosecution and that is that Nika and his victim were engaged in a conversation relative to Nika's car trouble and that the conversation escalated into a physical confrontation. Whether Nika was motivated by anger or by the intent to rob, we do not know; but it does not matter. What matters is whether there was an apparent motive. If we did not have this State's evidence, we might possibly indulge in the conjecture that Nika did not kill to rob or kill out of anger and that he therefore killed "senseless[ly]" just for the sake of killing itself; but the State's case is all we have. We cannot, given the evidence that was presented by the State to the jury, fairly conclude that Nika went out randomly and indifferently, and for no particular reason, indiscriminately shot and killed another human being.
In sum, then, there was nothing random about Nika's deciding, for whatever real or "apparent" motive, to kill this victim under the circumstances defined and described by the prosecution. There are, as I have explained, a number of "apparent motives" for this killing. The killing was neither random nor without apparent motive; therefore, Nika is not death-eligible, and his death sentence should be reversed.
*1061 ROSE, Justice, dissenting:
I find numerous serious faults with the majority opinion and, therefore, must dissent.

The district court erred in concluding that no custodial interrogation occurred.
The first error occurred when the district court permitted a sheriff's deputy to testify regarding Nika's incriminating statements given during a jailhouse classification interview conducted after Nika had invoked his Miranda rights. This issue was raised in district court, but was not addressed in Nika's briefs to this court. However, we can address constitutional issues sua sponte. McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983). The fact that Nika's counsel apparently conceded this point at oral argument is not binding on this court and seems more the product of poor lawyering rather than a competent adversarial decision.
Nika was questioned in Chicago on August 30, 1994, by Detective John Yaryan, and at that time, invoked his right to have an attorney present.[1] Thereafter, Nika was extradited to Nevada on September 1, 1994, and booked into the Washoe County jail. Nika's clothes were taken from him, and he was removed from the booking detention area and placed into a housing unit. On September 2, 1994, Nika had eaten a meal and was mixing with the general prison population when Colleen Villa, a plain-clothed deputy with the Washoe County sheriff's department who worked in the classification unit at the county jail, took Nika aside to ask him some questions from the classification form. Villa testified that every inmate had to answer the questionnaire so that the jail administrators could place the inmate in a safe housing unit. Villa also testified that she knew that Nika had been arrested for murder and also knew some of the facts of the case prior to interviewing Nika.
One of the questions Villa asked Nika was, "Have you ever assaulted or battered anyone?" Nika responded that he had fought with a man around 9:00 p.m. or 9:30 p.m. one evening and that the man was dead. He also stated that during the fight a gun was placed to "his" head, although Villa testified that she was unsure if that meant a gun was placed to Nika's head or that Nika had placed a gun to the victim's head.
At the outset, I would like to state that jail personnel should be permitted to ask any question they feel necessary for the orderly and safe confinement of a prisoner. The admission of the answers given by the inmate at trial is quite another matter, especially when the prisoner has invoked his Fifth Amendment right to remain silent and then is asked specific questions about whether he has ever committed the crime in question or a lesser-included crime. My response to this problem is certainly not to prevent jail personnel from asking even those questions if they feel it necessary. Rather, the admissibility of this evidence should be where the remedy is applied. To ascertain the nature and extent of that remedy, we must examine the law that has developed in this area.
An individual subjected to a custodial interrogation must be given his or her Miranda rights. Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980). Unless and until the Miranda rights are given and a waiver of those rights is obtained, no evidence procured as a result of the interrogation can be used against the defendant. Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). However, a well-established line of cases has created an exception to the Miranda rule for "routine booking questions" because such questions are not related to the investigation of the case and serve a legitimate administrative need. Pennsylvania v. Muniz, 496 U.S. 582, 601, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990); United States v. Booth, 669 F.2d 1231, 1238 (9th Cir.1981); Franks v. State, 268 Ga. 238, 486 S.E.2d 594, 597 (1997). Routine booking questions are limited to "`biographical data necessary to complete booking or pretrial services.'" Muniz, 496 *1062 U.S. at 601, 110 S.Ct. at 2650 (quoting United States v. Horton, 873 F.2d 180, 181 n. 2 (8th Cir.1989)); see also Franks, 486 S.E.2d at 597 (stating that basic biographical data is limited to a suspect's name, age, address, educational background, marital status, and any other information required to complete an arrest form).
The Ninth Circuit Court of Appeals has stated that while ordinarily routine gathering of background biographical data will not constitute interrogation,
we recognize the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect. Thus we emphasize that the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response.
Booth, 669 F.2d at 1238. This analysis must be made on a case-by-case basis. Id. at 1237-38.
The questions Deputy Villa asked Nika went beyond routine background information and were not completely unrelated to the underlying offense, even though they undoubtedly served the legitimate administrative need of classifying jail inmates. The questions posed to Nika were broad in nature and asked for intimate details of Nika's life, including his criminal history, gang affiliation, and sexual orientation. However, the question concerning whether Nika ever committed a battery on anyone was more specific and inquired about a lesser-included crime of the murder charge. If the response to this type of question is incriminating, it should not be admitted at trial. In this way, the exception to the ban on questioning a prisoner who has invoked his right to remain silent will not engulf the general rule. See People v. Rucker, 26 Cal.3d 368, 162 Cal.Rptr. 13, 26, 605 P.2d 843, 855 (1980) (concluding that jail officials can satisfy their demonstrated need for certain basic information necessary for proper jail administration, but the prosecution may not use the arrestee's responses in any manner in the criminal proceedings).[2]
Additionally, and more importantly, the questions Deputy Villa asked Nika were such that she should have known they were reasonably likely to elicit an incriminating response. Nika was arrested for murder, and the question, "Have you ever assaulted or battered anyone?" while presumably asked for a neutral reason, was asking Nika about a lesser-included offense. Furthermore, Nika did not speak English well, and in light of the transcript of the suppressed interview with Yaryan, it is clear that Nika did not understand with any degree of certainty his constitutional rights to have an attorney present and to remain silent. Despite the fact that Villa was reading from a standardized form, she knew that Nika had been arrested for murder, knew the details of the murder, and should have known, especially in light of Nika's unusual susceptibility, that the question was reasonably likely to elicit an incriminating response. Booth, 669 F.2d at 1238. Therefore, I believe that using Nika's answer to that question during trial was in violation of Nika's right to be free from custodial interrogation after he had invoked his Fifth Amendment rights.
Furthermore, the admission of the evidence was not harmless error because it cannot be proven beyond a reasonable doubt that the evidence did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Nika's statements to Villa constituted an admission that he had been involved in Smith's death in some fashion, although he did not admit specifically to Smith's murder;
*1063 this information likely influenced the jury's decision.
Based on this violation of Nika's federal constitutional rights, I believe that Nika is entitled to a new trial.

Inadequate instructions concerning NRS 200.033(9), the random and without apparent motive aggravator.
The jury was presented with three aggravating circumstances to consider in the penalty phase of this trial, whether the murder was committed during the commission of or attempt to commit a robbery, whether the killing was done to avoid arrest or effect an escape, and whether the murder was committed "at random and without apparent motive." The jury rejected the first two aggravators, but found that the killing was done at random and without apparent motive.
The jury's rejection of the "murder in the course of a robbery" and "murder to flee" aggravators and finding the "random and motiveless" aggravator was unusual considering the facts. There is abundant evidence to demonstrate that the killing was done to facilitate a robbery or escape, and had the jury found either aggravator, this would be a routine affirmance. By the brutal, execution-style killing, Nika has proven that he in general qualifies for the death penalty. But, when the jury returned only the one "random and motiveless" aggravator, we are compelled to determine whether the legal instructions given the jury were adequate for this case and if the facts presented support this sole aggravator. To put it simply, we must determine whether Nika's execution can be sanctioned by the rules with the facts as found by the jury.
The jury obviously considered whether NRS 200.033(9), the aggravating circumstance alleging that the murder was committed "at random and without apparent motive," had been proven beyond a reasonable doubt. The only assistance the jury received in considering this aggravator was the instruction that it could find that NRS 200.033(9) had been proven beyond a reasonable doubt if it concluded that the killing "was not necessary to complete a robbery." (Emphasis added.) This instruction was derived from our opinions in Bennett v. State, 106 Nev. 135, 143, 787 P.2d 797, 802 (1990), and Paine v. State, 107 Nev. 998, 999-1000, 823 P.2d 281, 282 (1991).[3] Since the jury rejected the "murder in the course of a robbery" aggravator, it seems logical to assume that the above instruction would be inapplicable since it dealt with a killing accompanying a robbery. This left the jury with only the language of NRS 200.033(9), a murder committed at random and without apparent motive.
We have never required that the random and without apparent motive aggravator be defined beyond stating to the jury the aggravator as defined in NRS 200.033(9). See, e.g., Greene v. State, 113 Nev. 157, 163, 931 P.2d 54, 58 (1997); Geary v. State, 112 Nev. 1434, 1445-46, 930 P.2d 719, 726 (1996). However, in this and several other cases, this court has struggled with the meaning of those terms and the application of those terms to the facts of a particular case. The facts of this case are not those that come to mind when you first think of a random and motiveless crime, as does the shooting of people from a rooftop or driving indiscriminately into pedestrians on a sidewalk. Here, Nika obviously had just met the good samaritan who apparently stopped to help him, and Nika killed him in the course of robbing him, or because the samaritan called him a foul name, or to aid his escape, or for no reason at all. The jury concluded Nika killed for no apparent reason at all, and it was the jury's prerogative to so conclude even if the other reasons may seem more plausible.
It is much more difficult to see how the jury concluded that Nika killed the samaritan *1064 "at random." He obviously had just met the samaritan who stopped to help him, and it is not at all apparent to me how Nika's killing could be classified as "at random" even if done without apparent motive. Perhaps the jury believed that it was uncertain who might stop to help Nika, and this was sufficient to provide the randomness element needed to find the aggravator. However, this is not the randomness I believe that the legislature contemplated when approving this aggravator.
This case seems closer to the factual situation presented in Geary where we held that the "random and without apparent motive" aggravator was constitutional; however, we reversed Geary's death penalty conviction because the evidence presented at trial indicated that the killing was neither random nor motiveless because the killing was directed at a specific individual and was done for a specified reason. Geary, 112 Nev. at 1446, 930 P.2d at 727. I see little difference between the situation presented in Geary and that in the present case. What all this demonstrates to me is that we need to define the terms used in this aggravator to better assist the jury in its difficult task of applying this aggravator to the facts of cases like this one.
Defining the terms "random," "apparent," and "motive" will give the jury guidance and "genuinely narrow the class of persons eligible for the death penalty." Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). We began this process in Geary v. State, 112 Nev. 1434, 1446-47, 930 P.2d 719, 727 (1996), but did not provide concrete definitions. The word "random" means either lacking a definite plan, purpose or pattern, or relating to a set whose elements have equal probability of occurring. Webster's Ninth New Collegiate Dictionary 974 (9th ed.1985). NRS 200.033(9) states that the murder must be "committed upon one or more persons at random and without apparent motive," and I believe that the statute is properly understood to mean that the victim must be selected at random and the crime must be committed on that randomly selected victim without apparent motive.
"Apparent" means or has been stated to mean "open to view" or "clear or manifest to the understanding." Webster's Ninth New collegiate Dictionary 96 (9th ed. 1985); see also State v. Moore, 250 Neb. 805, 553 N.W.2d 120, 128 (1996) ("Apparent" means that which is "readily perceptible"); Black's Law Dictionary 96 (6th ed. 1990) ("That which is obvious, evident, or manifest. . . . That which appears to the eye or mind; open to view; plain; patent.")
"Motive" has been defined as the "emotional urge which induces a particular act." 1 Witkin & Epstein, Cal.Criminal Law § 100, at 118-19 (2d ed. 1988); see also 21 Am.Jur.2d Criminal Law § 133, at 267 (1981) ("motive may be defined as that which leads or tempts the mind to indulge in a criminal act, or as the moving power which impels to action for a definite result"); United States v. Beechum, 582 F.2d 898, 912 n. 15 (5th Cir.1978) ("motive . . . has been defined as `the reason that nudges the will and prods the mind to indulge the criminal intent'" (quoting Slough & Knightly, Other Vices, Other Crimes, 41 Iowa L.Rev. 325, 328 (1956))).
According to these definitions, any emotional urge or passion which prompts a person to act will qualify as a motive. Commonly understood motives for murder include avarice, revenge, jealousy, fear, preventing discovery of a crime, evading arrest or prosecution, and conduct of the deceased in opposing or trying to injure the defendant. 1 Witkin & Epstein, Cal.Criminal Law § 100, at 119 (2d ed. 1988); Wigmore, Principles of Judicial Proof § 96, at 193 (2d ed. 1931). Being insulted can also be a motive for murder. See State v. Garcia, 99 N.M. 771, 664 P.2d 969, 973 (1983) (concluding that evidence existed to support a theory that the deceased had insulted the defendant's prison gang and the insult was the defendant's motive for the killing). I believe that defining the words used in this aggravator will assist juries in determining whether the facts fit this aggravator and it will increase our confidence that the correct factual determination was made when reviewing the case on appeal. I conclude that failing to give definitions of the critical words used in this aggravator left the jury with unreasonably vague guidelines when confronted with the facts of *1065 this case and that this case should be reversed and retried for that reason.

The State's inconsistent arguments on Nika's motive to kill.
Finally, I believe that it was improper for the State to argue during the guilt phase that Nika acted with a motive and then argue during the penalty phase that Nika acted without a motive. At trial, the prosecution presented a jailhouse snitch who testified that Nika told him that he had killed Smith because Smith had called him a "motherfucker," a term that Nika stated was a grave insult in his country of origin. Because the prosecution elicited this testimony in the guilt phase to show that Nika killed Smith and why he killed Smith, it cannot in the penalty phase or on appeal legitimately argue that such provocation did not provide Nika with a motive to kill Smith.[4]See Tore, Ltd. v. Rothschild Management Corp., 106 Nev. 359, 364, 793 P.2d 1316, 1319 (1990) (stating that this court will not permit an attorney or party to argue one theory at trial and another on appeal). The prosecution should not be able to present evidence and argue its validity at one portion of a trial and then repudiate it at another because it no longer serves the State's purpose.
In conclusion, I believe that Nika's constitutional rights were violated when his incriminating statement to jail personnel was admitted into evidence. Upon retrial I would discard the definition we have used in Bennett, Paine, and other subsequent cases that permits a finding of random and motiveless killing if murder was not necessary to complete the robbery and then define the three critical terms random, apparent, and motive with specificity.
NOTES
[1] Robbie Morrow stated that around 6:20 p.m. she noticed a "junky" looking brown Chrysler on the side of the road with the hood and trunk cover up. Morrow stated that she saw someone who appeared "dirty and grubby" in very short cut-off pants, a yellow tank top shirt, and white tennis shoes lying under the front of the car, apparently checking the engine.

Robin Aguire, who was in prison at the time of trial on an unrelated drug charge, testified that she and her mother were driving on I-80 between 6 p.m. and 6:30 p.m. and saw a brown car with its hood up. She identified Nika as the man standing next to the car.
Susan Tarbet stated that at approximately 7:20 p.m. or 7:25 p.m. she saw a man leaning against a brown car with his arms crossed. She also testified that she believed that the man she saw on the side of the road was Nika.
Jewell Waters was following her husband home from Reno and passed mile marker 34 at approximately 7:30 p.m. Jewell saw the brown Chrysler and identified Nika as the person in the car. Michael Waters, Jewell's husband who was driving ahead of Jewell, also indicated that Nika was the man that he saw by the car.
[2] This call was apparently made by either Sanchez or Boling.
[3] Evidence showed that when the BMW was found in Chicago, it had a "National" brand battery and that the battery purchased by the Smiths in July 1994 was not a National brand battery.
[4] The woman whom Izzo believed to be Nika's mother was in fact Nika's aunt. Apparently, Nika was the maintenance man in the apartment building.
[5] The mitigating circumstances offered to the jury were as follows:

1. The defendant has no significant history of prior criminal activity.
2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The victim was a participant in the defendant's criminal conduct or consented to the act.
4. The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.
5. The defendant acted under duress or under the domination of another person.
6. The youth of the defendant at the time of the crime.
7. Any other mitigating circumstance.
[6] Nika contends that the circumstances, though they create a strong suspicion of guilt, are as consistent with a theory of innocence as they are with a theory of guilt, and that there can be no conviction under such circumstances. See State v. Cerfoglio, 46 Nev. 332, 350, 213 P. 102, 103 (1923). This argument lacks merit. It impermissibly burdens the prosecution with having to disprove all other potential suspects and theories beyond a reasonable doubt. The State's burden in this case was to prove beyond a reasonable doubt that Nika murdered Smith. Therefore, it was not necessary to prove that Nika acted alone in committing the murder.
[7] There was, however, evidence in the record to support a charge for robbery since Nika was in possession of Smith's car when he was arrested in Chicago.
[8] Although the jury found a robbery occurred under the "random and motiveless aggravator," it did not find that the murder was committed by Nika during "the commission of or attempt to commit a robbery." NRS 200.033(9); NRS 200.033(4). Why the jury found facts to support a robbery under one aggravator but not another is not for this court to question. United States v. Carlos, 478 F.2d 377, 379 (9th Cir.1973) (recognizing the jury's role as the ultimate arbiter of facts).
[1] As far as I can discover, Nevada is the only state that employs the quoted phrase as an aggravating circumstance.
[2] "Apparent" is defined in the dictionary as:

Clear or manifest to the understanding; plain, evidence, obvious, palpable. . . . Appearing as actual to the eye or mind (distinguished from, but not necessarily opposed to, actual, true, or real); bearing, or supported by, such evidences of reality as lead to believe in the existence of the thing evidenced; seeming; . . . having such an appearance of reality as reasonably to appear true under the circumstances.
Webster's International Dictionary 129 (2d ed. 1948).
[3] The majority's point is that the State's case relating to Nika's being motivated by robbery, anger and defense of his mother's honor does not furnish evidence of even an apparent motive to kill. The position of the concurring justice is even stranger. The concurring justice argues that the jury could have rejected all of the State's evidence relating to Nika's robbing the victim as well as the State's evidence relating to Nika's anger and then have properly come to the conclusion that the murder was not motivated at all but, rather, was "senseless" and "apparently motiveless."

I would remind my concurring colleague that "absence of evidence is not evidence of absence" and that even if the jury rejected all the State's evidence on how this killing took place, this still would not permit the jury to conclude that there was not at least an "apparent" motive. It is, of course, unreasonable and unlikely that the jury would have rejected the State's entire case (except the killing part) and on that basis have concluded that no motive for the killing was "apparent." Even if the jury had rejected most of the State's case and concluded that there was not present in this case some true motive, the jury simply could not have reasonably concluded that there were no "apparent" motives in this case.
As understood and expounded in the Rose dissent, what the prosecutor was really arguing to the jury in this case was something like this:
This man unlawfully murdered a man out of anger just because the man called him a motherfuckeror would you believe, instead, that he was motivated by robbery? If you do not believe either of these, would you believe he killed for no apparent reason at all?
Again, even if, as the concurring opinion suggests, the jury might have rejected all of the State's evidence relating to what the State claimed were Nika's motives to kill, this would not mean that the jury was entitled to find, beyond a reasonable doubt, that the killing was "apparently motiveless." There is absolutely no evidence in this case that Nika acted without any real or apparent motive. The jury was not, as the concurring opinion suggests, entitled to conclude under the evidence produced by the State that Nika had no apparent reason, no inducement, no incitement to kill and that he, whimsically, and for no particular reason, killed merely for the sake of killing.
[1] The content of that interview was later suppressed by the district court after it concluded that Nika had invoked his right to an attorney but that Yaryan had continued to interrogate Nika.
[2] In People v. Hall, 199 Cal.App.3d 914, 245 Cal.Rptr. 458, 461 (1988), the appellate court stated that California Proposition 8 (adding article 1, section 28(d) to the California Constitution) abrogated Rucker. Proposition 8 stated in pertinent part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding. . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay." Hall, 245 Cal.Rptr. at 461 n. 3. Rucker might have survived Proposition 8 because it relied on the federal Constitution, but in any event, the rationale of Rucker is persuasive and should be followed by this court.
[3] This court has not always interpreted this aggravating circumstance this way. In Moran v. State, 103 Nev. 138, 142-43, 734 P.2d 712, 714 (1987), and Geary v. State, 112 Nev. 1434, 1446-47, 930 P.2d 719, 727 (1996), we did not use such a definition. Instead, we examined the facts to determine whether the murder was committed without motive and at random, relying on the common usage of those words. Upon reflection, I believe the instruction used in the instant case is incomplete, misleading, and nonsensical, and our legal system would be better off if it were jettisoned.
[4] The prosecution also elicited testimony that Nika killed Smith in order to steal his car, but the jury apparently did not believe this testimony because it did not find that Nika killed Smith in the commission of a robbery pursuant to NRS 200.033(4). However, such testimony provided evidence regarding Nika's motive, and it was improper for the prosecution to present such evidence of a motive during the guilt phase and then claim during the penalty phase and on appeal that no motive existed.